## No. 1630
### Second Circuit Appeal

MRS. ELIZA MAXWELL v. T. R. MAXWELL

(Jan. 12, 1925, Opinion and Decree.)
(Feb. 2, 1925, Rehearing Denied.)

*(Syllabus by the Editor.)*

1. **Louisiana Digest—Marriage—Par. 43.**
In view of Article 2247 of Civil Code, a private agreement of separation of property between married persons is null.

2. **Louisiana Digest—Marriage—Par. 63.**
A private agreement of separation of property between spouses, although null, is susceptible of ratification making it binding on the party ratifying it.

3. **Louisiana Digest—Obligations—Par. 127, 128.**
There is a rule of law, to which we know of no exception, to the effect that a party cannot successfully attack a commutative contract while holding on to the benefits which he has received from it.

4. **Louisiana Digest—Estoppel—Par. 41, 45.**
Where a private settlement of community property which is null under the law had been made between the husband and wife and the widow, after the death of the husband, expressly acquiesces in the sale of property which should have been community property, by signing the act of sale, the widow has ratified the sale and is estopped from claiming the property sold.

5. **Louisiana Digest—Estoppel—Par. 12, 41, 45.**
Where a private settlement of community property, which is null under the law, had been made between the husband and wife, and the widow, after the death of the husband, expressly acquiesces in the sale of property which should have been community property, by signing the act of sale, the widow has ratified the sale and is estopped from claiming error of law or fact.

Appeal from the Thirteenth District Court, Parish of Grant. Hon. Jno. A. Williams, Judge.

This is a suit to have an act of sale declared a nullity.

There was judgment for defendant and plaintiff appealed.

Judgment affirmed.

Wiley Jones, of Colfax, attorney for plaintiff, appellant.

Huey P. Long, of Shreveport, attorney for defendant, appellee.

### STATEMENT OF CASE.

ROBERTS, J. The plaintiff, Mrs. Eliza Maxwell, was married to W. H. Maxwell something like fifty years ago, and after rearing a family of children, issue of the marriage, became estranged in their feelings toward each other, and as a result of such estrangement, voluntarily separated, and effected, or attempted to effect, an extra-judicial division of the community property accumulated during the marriage, by means of a notarial act made in the form of a "Dation En Paiement," wherein a certain forty-acre tract of land therein described is appraised by two appraisers, at $150.00, and wherein W. H. Maxwell declares that he is indebted to his wife in the above named sum, and that the forty acres of land is given in payment of the debt then acknowledged to be due his wife.

The act of Dation En Paiement contains a further stipulation that the wife "hereby renounces her right to all her community rights".

After having lived apart from plaintiff, his wife, since 1906, W. H. Maxwell died on June 10th, 1921.

In the meantime, he had sold that portion of the community not transferred to his wife, and had invested the proceeds in eighty acres of land situated in Grant Parish, and described as the E½ of NE¼ of Section 9, Township 9 N. Range 1 East.

Soon after W. H. Maxwell's death, his five children all majors, and the surviving widow, plaintiff herein, executed a deed before S. M. Abel, Notary Public, to the defendant, T. R. Maxwell, for a consideration of $1,500.00, covering the eighty acres of land in dispute.

When the deed was signed by the plaintiff and her five children, the Notary, to whom defendant had handed his check book, with the request that he draw checks in favor of the several vendors, asked plaintiff what part she was to get, and she told him that she had no part, that she was always left out.

Thereupon, the Notary drew five checks for $200.00 each, which, together with five notes for $100.00 each, were delivered to the five children in payment of the agreed purchase price of $1,500.00.

It appears that the price paid by defendant for the property exceeded, by $500.00, the next highest offer that had been made for the property.

About the same time the sale of the land in controversy was executed, the five heirs of W. H. Maxwell made a partition of eleven head of cattle left by their father, and according to the undisputed testimony, the plaintiff herein made no claims, and received no share in the division of the cattle.

The sale of the property in controversy was executed on June 25th, 1921, and on November 4th, following, plaintiff filed this suit to set aside the sale, insofar as same affected her interest in the property, alleging that she was induced to sign the deed through the artifice of defendant; that the sale was made without price or consideration; that if it be construed to fix a consideration, then said deed recites an error, the true facts being that there was no price and no consideration ever agreed upon between petitioner and said T. R. Maxwell.

"That the only cause which induced petitioner to subscribe her name to said pretended deed and act of sale, was that petitioner was led into error of law, and induced to draw an erroneous conclusion of law relating to an undivided one-half interest in and to said land being invested in petitioner at the death of her said husband, and that her erroneous conclusion of law was caused, created and continued by artifice on the part of said T. R. Maxwell, and with design on his part to obtain an unjust advantage for himself, and to cause a loss to petitioner."

"That said T. R. Maxwell falsely asserted to petitioner: that she had not title or interest at all in and to said land by operation of law or otherwise; and furthermore, the said T. R. Maxwell suppressed from petitioner what was and is true as to petitioner having title to an undivided one-half interest in and to said land."

"That these false assertions, and the suppression from petitioner of what was and is true on the part of said T. R. Maxwell, deceived petitioner, and was the sole and only cause of her being led into said error."

The defendant's answer admits plaintiff signing the deed, but denies that she signed through any error, either of fact or of law. Defendant further denies the practice of artifice or deception in procuring plaintiff's signature to the deed, and denies ever having had any conversation with her about the matter.

It is further averred by defendant that he purchased all rights of plaintiff and the heirs of her deceased husband, W. H. Maxwell, in and to said property, having paid therefore the sum of $1,500.00, which was more than the property was worth; that he authorized S. M. Abel, the Notary Public who drew and prepared the said deed for signature, to draw checks for the signature of defendant, paying out the said $1,500.00 consideration then and there agreed upon among the said vendors, and that the said plaintiff participated in said proceedings and authorized and instructed the said S. M. Abel how to draw said checks, and that defendant, in this manner

paid out the sum of $1,500.00 for a deed to said property; that said plaintiff having signed said deed, and authorized and instructed the manner of the distribution of the said consideration, is fully estopped from denying receipt of any amounts that may have been due her, and defendant now expressly pleads said estoppel."

Defendant further averred that the real reason why plaintiff did not claim any part of the proceeds of the sale, was that on March 26th, 1906, she and her husband had a division of property, and that as shown by said so called "Dation En Paiement" of said date, the deceased husband of plaintiff made her a deed to forty acres of land which she still owns and retains, and that she relinquished all her rights to all the remaining community property.

On the issues as above set forth, the case went to trial, resulting in a judgment rejecting the plaintiff's demands, from which she has appealed to this court.

OPINION.

Taken as a whole, the testimony shows that the plaintiff and her deceased husband had not lived together as man and wife during a period beginning in 1906, when they divided the community property, and ending with the husband's death in 1921; that neither their separation, nor the division of the community, affected between them, had ever been effectuated by judicial decree of any Court; that plaintiff still retains the forty acres of land conveyed to her in 1906; and as between plaintiff and her five children, has acquiesced in and ratified the division of community made in 1906.

We quote below from the brief of defendant's counsel, a number of extracts from the testimony of plaintiff's witnesses:

Mrs. Eliza Maxwell testified in part: "Referring to the sale and defendant, she said, 'He never spoke to me about it".

When asked about her son, Ivy, working up the trade, she said, "he came over there * * * and went to see Rich Maxwell about the place and sold the place to him. The children all went off and didn't ever talk to me about it, but when they got ready for selling, they wanted me to go to the Lumber Company office at Rochelle, and wanted me to go there and sign the deed, and I would not go, and they brought Morgan Abel to the house' (tr. 27). Asked if she knew then that she owned an interest in the property she replied: 'Yes, sir, I think I ought to, I didn't know for certain that I did, but knew that I ought to have'. (tr. 27) She admitted that in 1906, she and her husband had a division of property in which she was given the forty acres of land she now owns. (tr. 28 and 31) Also stated that 'I expect it will stay there until the children do just like they did this other". (tr. 32). She stated out of the division to buy the land in controversy. (tr. 36) She said that she had made no demands upon any of her children for any part of the purchase price, and that she does not want any of it from them. (tr. 61 and 62.)"

S. M. Abel, the Notary Public, a man of at least twenty years' experience in important positions, such as Deputy Clerk of Court, testified in part:

"I obtained my confirmation as to the transaction and that sale from Ivy Maxwell, and with the additional information I had sought from T. R. Maxwell with reference to the consideration." That deed was executed "in Mrs. Eliza Maxwell's house * * * All parties that I considered interested were present. * * * I wrote out the notes and the checks for the purchase price * * * and prepared the deed, and carried it over to Mrs. Maxwell's. * * * I had two witnesses to cover over * * * I read the deed * * * I heard no objection from any one, and I asked Mrs. Maxwell to sign first and she came and signed by making her mark. * * * The other five heirs came

around and signed the deed as their names had been given to me, and when I went to write the checks and make payment, I asked Mrs. Maxwell where her interest came in, or words to that effect; she related to me that she didn't consider she had any interest in the property. * * * I wrote checks for $200.00 each to the heirs, and they agreed to accept Mr. Maxwell's notes for $100.00 each, lieu of cash; the deed was signed, the checks for $200.00 each and the notes for $100.00 each was delivered to the heirs * * * the witnesses to the deed signed, the deed, and I considered the business closed." (tr. 40) As to the purchase price. "He paid more for the place than I would have paid for it." (tr. 41.)

Miss Eliza Maxwell, the single daughter living with plaintiff, testified in part:

When asked on cross examination about Ivy Maxwell working up trade and staying with them at night while at it, said, "He came and stayed, and we agreed to take $1,500.00. (tr. 75) * * * He stayed some, I don't know how many nights". (tr. 76) That they divided up the cattle without giving their mother any, or her contending for any. (tr. 77.)

J. L. Maxwell, son of plaintiff, testified in part:

"We wrote him (Ivy) a letter and told him that whenever he came, we would try to dispose of the property. * * * My sister Ella did. Me and my youngest sister talked it over." (tr. 84) That his mother knew that Ivy had been written to come sell the property. (tr. 85.)

There are other witnesses along same line, but we deem it of no value to mention what they had to say.

Plaintiff tried strenuously to make it appear that she and her deceased husband had lived together since they separated in the year 1906, but she utterly failed.

J. L. Maxwell testified that his mother had nothing to do with his father thereafter until he went to die, when she came about him a little. (tr. 84.)

Miss Ella Maxwell, who tried hard to make it appear they were living together, was forced to admit that they had never slept together. (tr. 74.)

Mrs. Fannie Long, her daughter, who lived near her, and at whose home her father died, testified in part:

"No sir, he (her father) has been at her house, but as for living together as man and wife, they have not." (tr. 64.)

W. J. Long, who has lived near the plaintiff for over thirty years, said that if they had lived together since 1906, he had not heard of it, nor seen anything indicating such. (tr. 59.)

Tom Hodge, who lived within 200 yards of her for the last 27 years, testified that if she and her husband had lived or stayed together since 1906, he had seen nor heard nothing of it; that he had heard her say in the Court house at Winnfield about seven years ago that she never expected to live with him. (tr. 55.)

N. Parker, who lived near her for nine years before her husband's death, testified that he had seen nothing indicating in any manner that plaintiff and her husband were living together.

We find nothing anywhere in the testimony to indicate that the defendant practiced any artifice or deception on the plaintiff in order to procure her signature to the deed. Neither is it shown that he endeavored to obtain any "unjust advantage" over her, nor that he caused or tried to cause the plaintiff any "inconvenience" or any "loss". It is not shown that defendant prevented plaintiff from receiving her portion of the purchase price paid by him. It could make no difference with him whether the plaintiff received the money or whether the children received it. The plaintiff herself directed the Notary to make the checks payable to her children, although she states that she "thought" she owned interest in the property.

Had the plaintiff,. following her husband's death, chosen to stand upon her legal rights, either by refusing to sign the deed, or by claiming half the purchase price, this lawsuit could not have arisen. The truth appears to be that neither at the time of the sale now attacked, nor even now, does the plaintiff wish to assert her community rights as against her children, but only in such manner as will bring a gain to her and inflict a loss on defendant— without disturbing the arrangement with the children, which had been acquiesced in, if not made a matter of express agreement between her and her children, following the death of her husband, W. H. Maxwell.

Article 1786 of the Civil Code, reads in part as follows:

"The unauthorized contracts made by married women, like the acts of minors, may be made valid after the marriage is dissolved, either by express or implied ratification."

Plaintiff's ratification of and acquiescence in the unauthorized and illegal contract entered into with her husband in 1906—subsequent to the dissolution of the community by the death of her said husband and no doubt caused the defendant to pay over the whole purchase price of the property to plaintiff's five children. While the contract was, no doubt, invalid at the time it was executed, and remained so up to the time of the dissolution of the community by W. H. Maxwell's death, we are of the opinion that said contract has been rendered valid—at least insofar as the defendant is concerned, by plaintiff's ratification of it, and that she is now estopped from urging her present demand.

"A married woman, living in community with her husband, may be held liable on contracts. made by her, which enure to her separate benefit, when to hold otherwise would be to enable her to perpetrate a fraud." Ackerman vs. Larner, 116 La.

101, 40 South. 581. See also Kohlman vs. Cochrane, 123 La. 219, 48 South. 914.

"Where a woman, after the termination of her marriage, pays interest on her unauthorized debt, she thereby ratifies it." O'Keefe vs. Handy, 31 La. Ann. 832.

"So she may ratify a debt contracted for her deceased husband's benefit by acknowledging it in writing, and promising to pay it." Lafitte vs. Delaney, 33 La. Ann. 659.

It is not deemed necessary to discuss the allegations of error further than to say there is no proof whatever to show that defendant procured plaintiff's signature to the deed sought to be set aside, either by means of suggestions that were false, or by the suppression of what was true in relation to the contract.

For the reasons given, the judgment of the District Court is hereby affirmed.

---

### ON A REHEARING

QDOM, J. This case is before us on application for rehearing.

It was decided in the District Court on Jan. 4, 1922, and appealed to this Court where the judgment of the lower court was affirmed, Judge Roberts, being the organ of the court.

An application for rehearing was filed on Feb. 2nd, 1923.

We find in the record an opinion on the application for rehearing, written by the late Judge Porter, then a member of this court. Just why the opinion was not handed down we are not informed.

As that opinion is in accord with our views, we adopt it and make it our own.

PORTER, J. In March, 1906, Henry Maxwell and his wife, the present plaintiff, who had lived together as husband and wife for many years, entered into a notarial agreement, which had the effect of disolving the community of acquests and gains between them, and a division of the community

property, This property consisted of two tracts of land, one of 40 acres and the other of 80 acres. The former was the home place with the buildings and improvements thereon. The other tract was unimproved. Mrs. Maxwell was given the home place, while the 80 acres went to the husband.

Mrs. Maxwell has resided upon that part which fell to her ever since.

The husband and wife never lived together afterwards. There is no pretension that the division was unfair, or that Mrs. Maxwell did not receive all that would have been due her if a judicial separation of property had been regularly rendered and executed.

The husband sold the land which he received and, it appears, reinvested the price in the 80 acres in controversy.

The husband died on June 10, 1921.

Some 15 days after his death, the five children, all of age, sold the 80 acres to the defendant for $1,500.00, all of which was paid at the time or has been paid since. Mrs. Maxwell, the plaintiff, joined in that deed.

Of course the agreement of separation in 1906 was a mere nullity. C. C. 2247. But it does not fall within the classes of nullities which are not susceptible of ratification, when the disability from which the nullity flows, ceases.

The question was fully discussed in Brownson vs. Weeks, et al., 47 La. Ann. 1042, 17 South. 489. It is a leading case and has been expressly affirmed in a number of cases since. Among them see Munholland vs. Fakes, 111 La. 932, 35 South. 983; Weathersby vs. Springfield Lumber Co. Ltd. et al., 141 La. 578, 75 South. 416; Cox vs. Lea's Heirs, 110 La. 1036, 35 South. 275.

The question in the Brownson case was whether a note given by a married woman to secure the payment of a debt of her husband could be ratified after the dissolution of the marriage.

The court held, in substance, that the incapacity of the wife to contract the debt was due to her personal status, and hence that when the community was dissolved by the death of her husband, she could ratify it. A distinction was drawn between two kinds of absolute nullities, viz: "Those resulting from stipulations derogatory from the force of laws made for the preservation of public order of good morals, and those established in the interest of individuals". It is clear, we think, that the nullity of the agreement of separation in this case falls within the latter class. It will hardly be denied that this plaintiff, who possessed all of the rights and powers of an American Citizen, could, if she had seen fit to do so, have entered into a formal agreement with her children ratifying the contract.

The testimony shows that the negotations for the sale of the land to defendant extended over several days; that a number of conferences were held between the defendant and the heirs of plaintiff's husband, and the plaintiff was present at one of them at least, and she made no protest, and claimed no part of the land. Neither did she make any objection at the time the deed was executed and when she signed it. It cannot be doubted that defendant would have refused to buy it if she had done so. It was her conduct and her express acquiescence, evidenced by her signature, which caused him to put out his money. Her conduct in that respect amounted to ratification, and she is, in all good conscience, estopped from attacking the sale now.

But she is estopped for a stronger reason. The contract of separation was an invisible one. She cannot repudiate a part of it and affirm a part of it. Her suit and her attitude before the court

amounts to this. She is seeking to hold on to the perfect ownership of all of the forty acres which she got under the contract, when she was entitled to but an undivided half interest in it, and at the same time to get back either a half interest in the 80 acres, or else recover half of the price which defendant paid for it. She virtually affirms that part of the contract which benefits her and repudiates that part which does not.

By affirming a part of the contract, she affirms the whole of it, and therefore ratifies it as a whole.

Besides there is a rule of law, to which we know of no exception, to the effect that a party cannot successfully attack commutative contract while holding on to the benefits which he has received from it. See Lathan vs. Heckey, 21 La. Ann. 425, and numerous cases cited in La. Digest, Vol. 5, pages 638 and 639.

The rehearing ought to be denied.

For the reasons assigned, the application for rehearing is denied.