162 So.2d 733 (1964)
Mrs. Louise DUPUY, divorced wife of Eugene B. TILTON,
v.
Eugene B. TILTON.
No. 1362.
Court of Appeal of Louisiana, Fourth Circuit.
April 6, 1964.
*734 Henican, James & Cleveland, C. Ellis Henican and C. Ellis Henican, Jr., New Orleans, for plaintiff-appellee.
William M. Campbell, Jr., New Orleans, for defendant-appellant.
Before HALL, TURNER and BARNETTE, JJ.
CHRIS T. BARNETTE, Judge pro tem.
This case involves a suit by a divorced wife to enforce certain provisions of a property settlement contract entered into between the spouses before the dissolution of the marriage. The marital contract was incorporated by reference in the judgment of divorce which was rendered in Nevada. Plaintiff contends it was further ratified by the defendant husband by various acts after the divorce had been rendered.
The husband has reconvened and in doing so urges on various grounds that the contract is null and void and should not be recognized by this Court. What he urges in effect is that the contract be declared null and that an equitable partition of the property of the marriage be ordered to take place anew without any reference to the contract. He contends that this type of contract is void ab initio and cannot be ratified by the parties, citing Articles 1790, 2427 and 2446 of the LSA-Civil Code of Louisiana, Sonnier v. Fris, 220 La. 1085, 58 So.2d 393; Kelly v. Kelly, 131 La. 1024, 60 So. 671 and other cases. He also urges that the Nevada judgment ratifying the agreement is not entitled to full faith and credit as far as it purports to govern the property affairs of the parties in Louisiana, though he maintains that as a personal judgment of divorce the Nevada judgment is valid.
The facts of this case are as follows: The husband, Eugene B. Tilton, forty-three years of age, a college graduate and apparently a successful businessman prior to his marital difficulties, after seventeen years of marriage became interested in another woman and determined to marry her, and as we shall see later, at any cost. In October of 1959, he made a trip to Texas for a week, and upon his return announced to his wife that he wanted a divorce. Mrs. Tilton apparently attempted to salvage their marriage for their own sake and that of their three children by having defendant speak to her brother and also to a spiritual adviser, but this was of no avail. About this time Tilton wrote down the things which he wanted to give Mrs. Tilton in case of a divorce; they were substantially the same items later included in the settlement agreement with which this suit is concerned.
On January 29, 1960, Mr. Tilton told his wife that he wished to journey to Phoenix, Arizona, for "meditation." A series of three letters was immediately begun by Mr. Tilton to his wife, the first of which gave no indication of his immediate plans, followed in a few days by a letter postmarked Las Vegas, Nevada, February 6, 1960, announcing his intention to establish residence in Nevada for the purpose of obtaining a divorce as quickly as possible. He enclosed a list of proposals in this letter which formed the basis of the property agreement, listing the things he would give and obligate himself to do for Mrs. Tilton and the things which he would obtain in settlement free of any claims by Mrs. Tilton. For himself he asked for certain movable property, the Tilton Marine Equipment Company, some real property in Texas and the assurance that his wife would not oppose his immediate divorce and would cooperate to that end. Mr. Tilton told his wife to show the letter to her present attorney, Mr. Ellis Henican, and exhorted her to "sign the necessary papers to allow me to get a legal divorce in Nevada."
After some correspondence between Mrs. Tilton's attorney and Mr. Tilton, a settlement agreement was entered into substantially as initially proposed by Mr. Tilton. This agreement was executed on March 22, 1960, prior to the divorce. On April 6, 1960, the divorce decree, as submitted by Mr. Tilton's Nevada attorney, was rendered. This decree purported to confirm the marital agreement by reference. On the day of the divorce Mr. Tilton married his former secretary.
*735 Following the divorce Tilton returned to New Orleans, and shortly thereafter, Mr. and Mrs. Tilton met in Mrs. Tilton's attorney's office. At this meeting Mr. Henican told them that to insure the enforceability of the property settlement, the parties should ratify it. Mr. and Mrs. Tilton proceeded to ratify this agreement of March 22, 1960, in many different ways, which will be mentioned later, but particularly by the execution of a formal act of ratification dated April 15th, but which defendant did not sign and return until some time in August, 1960.
As stated above, this suit originated when Mrs. Tilton sued to enforce certain provisions of the marriage agreement. Mr. Tilton urged in reconvention that the marital agreement was null, could not be ratified and was not made a part of the Nevada judgment that Louisiana would have to recognize under the full faith and credit clause. In answer to the reconventional demand, plaintiff urges that the agreement though null when made during the marriage was subsequently ratified after the dissolution and that such ratification estops the defendant from challenging the agreement. In the alternative, plaintiff urges that the marital agreement was incorporated into the Nevada judgment of divorce and is entitled to full faith and credit. The trial judge found in plaintiff's favor, both as to the original suit and the reconventional demand. Defendant appealed to this Court.
First of all it is necessary to consider defendant's reconventional demand, since if the contract sued on here is not capable of enforcement plaintiff's action must automatically fail. If we find the Louisiana law to be that an interspousal marital settlement agreement can be ratified after the dissolution of the marriage and that Mr. Tilton did in fact so ratify this particular agreement, it will be unnecessary to consider how far the Nevada judgment of divorce incorporating the marital agreement is binding on Louisiana courts under the full faith and credit clause of the United States Constitution. In this event it would only be necessary for this Court to recognize the validity of the divorce itself, a fact that neither party is contesting.
Let us first consider the Civil Code provisions on interspousal contracts. Article 1790 is found in the section of the Civil Code on Obligations under the sub-title "Of the Parties to a Contract, and of Their Capacity to Contract." It reads as follows:
"Besides the general incapacity which persons of certain descriptions are under, there are others applicable only to certain contracts, either in relation to the parties, such as a husband and wife, tutor and ward, whose contracts with each other are forbidden; or in relation to the subject of the contract, such as purchases, by the administrator, of any part of the estate which is committed to his charge, and the incapacity of the wife, even with the assent of the husband, to alienate her dotal property, or to become security for his debts. These take place only in the cases specially provided by law, under different titles of this Code."
This article, if it stood alone would invalidate all contracts between married parties. However, as far as sales are concerned, Article 2446 provides that this special type of contract can take place between married parties in special circumstances. This article is found in the section of the Civil Code on Sales under the sub-title "Of Persons Capable of Buying and Selling." A further attenuation of Article 1790 is found in Article 1746 which declares that married people can donate between themselves to the same extent that they can donate to strangers.
There is a special Codal provision on separation of the property of the marriage during the existence of the marriage. This article is 2427. It reads as follows:
"The wife must petition for the separation of property, and it can only be ordered by a court of justice, after hearing all parties. It can, in no case, be referred to arbitration.

*736 "Every voluntary separation of property is null, both as respects third persons and the husband and wife between themselves."
This is the article that we are interested in for this particular case, since the contract in this case was apparently a separation of property. Article 1786 of the Civil Code reads as follows:
"The incapacity of the wife is removed by the authorization of the husband, or, in cases provided by law, by that of the judge.
"The authorization of the husband to the commercial contracts of the wife is presumed by law, if he permits her to trade in her own name; to her contracts for necessaries for herself and family, where he does not himself provide them; and to all her other contracts, when he is himself a party to them.
"The unauthorized contracts made by married women, like the acts of minors, may be made valid after the marriage is dissolved, either by express or implied ratification."
This article was cited in Maxwell v. Maxwell, 1 La.App. 413, and in plaintiff's brief for the proposition that separation of property agreements made during the marriage can be validated by subsequent ratification. However, a fair reading of the article shows that it probably was intended to apply to various contracts which the wife could not make without the authorization of the husband or of a judge. The married woman has been freed from these restrictions by various amendments to the Married Women's Emancipation Act (LSA-R. S. 9:101), which have made the ratification section of this article unnecessary.
The Married Women's Emancipation Act itself was thought by some to mean that a married couple could contract for the separation of property during the existence of the marriage (see Vol. 34 Tul.L.Rev., pages 29 and 30; Vol. 8 Tul.L.Rev., page 117). However, in cases decided after the last amendment of the Married Women's Emancipation Law, the Supreme Court has emphatically held that separation of property agreements made during the marriage are null (Sheard v. Green, 219 La. 199, 52 So.2d 714 (1951) and numerous cases cited therein). The Court has held then that the Married Women's Emancipation Law did not overrule the restriction against voluntary separation of property agreements during the existence of the marriage found in Article 1786 of the LSA-Civil Code.
We now consider the jurisprudence pertaining to the important question of whether or not these agreements which are admittedly null when made during the marriage can be ratified by the parties after the marriage has been terminated by divorce.
Maxwell v. Maxwell, supra, is a case involving a separation agreement ratified by the wife after the husband's death. The court quoted LSA-Civil Code Article 1786 and said that this agreement could be ratified by the wife after the death of the husband, though during the existence of the marriage the contract was admittedly null.
Dares v. O'Donnell, La.App., 151 So. 774, is another case involving ratification of a marital settlement that was null when made. In this case the marital property settlement was entered into before the divorce judgment was final because the trial judge had not signed the decree. The court held that although the agreement was not valid when made, it had been ratified by the parties after the divorce judgment had been signed since the invalidity of the act was due to a relative and not an absolute nullity.
Sonnier v. Fris, 220 La. 1085, 58 So. 2d 393 (1952), is relied on heavily by the defendant in reconvention, and he urges that it stands for the bald proposition that there can be no ratification of this type of contract after the marriage. A close reading of this case will show that it does not stand for this proposition.
Anne Sonnier sued Rene Fris, her former husband, to have declared null and *737 void certain authentic acts concerning immovable property which the parties executed during their marriage. The District Court entered judgment for plaintiff and was affirmed by the Supreme Court. The two acts involved were in the form of a transfer and donation by the husband to the wife of his interest in certain immovable property acquired during the community (the family home) and the other a disclaimer of interest by the wife in favor of the husband as to certain other immovable property likewise acquired during the community.
When the plaintiff-wife instituted the suit to have the acts declared null, defendant opposed on the ground that the plaintiff was estopped to claim any part of the community because of a final settlement as evidenced by the authentic acts. Although the plea of estoppel was overruled by the trial judge and the defendant ordered to file an accounting of all the community property, the court did not pass on the validity of the authentic acts, and suit was brought for the specific purpose of having them declared null and void on the ground that they fall within the prohibited transactions between husband and wife.
The court held that defendant's contention that the object of the acts was to effect a dissolution of the community was legally unsound, since, as such, they were nullities under Article 2427 of the LSA-Civil Code.
The court then said that the acts appeared to be an attempt not so much to effect a separation of the community as such, but rather to vest, each in the other, the separate and undivided ownership of a specific parcel of community property in the manner of a sale. The court said that this was likewise a null attempt since Article 1790 governed sales between the spouses and did not authorize this particular sale.
So what the court held in this case is that the interspousal agreement to split the community made during the marriage is null. This is well settled in Louisiana and we have no quarrel with it. What we are concerned with here is whether such a null agreement can be ratified by the parties after the dissolution of the marriage or, in other words, after the disability is removed from the contracting parties. In Sonnier v. Fris, supra, (quoting from page 395 of 58 So.2d), the Supreme Court considered this question and its language is pertinent:
"* * * Since the writing of this opinion, the attorney for the defendant has filed a brief here urging that by the actions of the plaintiff in exercising the prerogatives of ownership after the incapacity was removedby accepting the revenues, paying the taxes, and claiming homestead exemption `on the share which she had acquired by the Acts of Partition, she has ratified and acquiesced in the settlement agreement and is legally bound thereby,' since `one cannot reap the benefits of an agreement and at the same time attempt to repudiate it.' He further contends that because of her actions, she is estopped to claim that she did not acquire title to the property by the Act.
"The cases cited by the defendant in support of his position are inapposite from a factual standpoint and are therefore not controlling. A perusal of the record discloses that the rental collected was $7 a month, the amount necessary to pay the homestead; there is nothing therein to indicate that she intended to ratify, and the filing of this suit negates such intention. Needless to say, the plaintiff could not have given a merchantable title had she attempted to sell. While the record does not disclose exactly when the plaintiff, a resident of Mississippi for the past several years, became apprised of her rights, certainly a period of less than a year before bringing the *738 suit for partition cannot be considered a ratification through silence and inaction on her part. * * *" (Emphasis ours)
We see nothing in this opinion of the Supreme Court that overrules the holding in the two quoted Court of Appeal cases that these interspousal agreements admittedly null during marriage, cannot be ratified after marriage by clear acts of ratification by the spouses. On the contrary, the underlined portions of the opinion in Sonnier v. Fris, quoted above, clearly imply that a ratification may very well estop the ratifying party from suing to have the contracts declared null. Had the Supreme Court meant that such agreements can in no manner be ratified, its above discussion would have been entirely unnecessary.
The Supreme Court has held that although these agreements are null and void during the marriage, they are binding where incorporated in the judgment of divorce or entered into subsequent to the dissolution of the marriage community. (Sheard v. Green, 219 La. 199, 52 So.2d 714, and cases cited therein.) The reason that the agreements can be entered into subsequent to the dissolution of the marriage community is that the disability (the fact that the parties were married) is removed, and the parties are single and perfectly free to contract in any way they see fit. If they are free to make such a contract, it is difficult to see why they should not be able to ratify a contract which was made during marriage but later followed and relied on because of a ratification after the marriage.
These agreements are fairly common. It would seem to be unfair to allow one party to sue to have them nullified after he or she has accepted the agreement by clear and unequivocal acts of ratification. Innocent third parties as well as the sued spouse may suffer from such a ruling. If an agreement is unfair this can be brought up at the trial of the divorce, or afterward, if one or both parties choose not to follow the agreement and refuse to ratify it. It would not then be too late for the court to order an equitable settlement. Two Courts of Appeal have held in the Maxwell and Dares cases, supra, that such agreements are ratifiable and that a party who ratifies can be estopped from bringing suit to nullify the agreement. This seems to be a just and legally sound decision. If clear unequivocal ratification can be found in this case, the plaintiff in reconvention is estopped from urging the nullity of the agreements.
Having found that the Louisiana law is to the effect that an interspousal division of property made during marriage can be validated by ratification after the termination of the marriage, it becomes necessary to find if this particular agreement was ratified by Mr. Tilton. We find that it was.
First of all the divorce in this case was rendered on April 6, 1960. The instant suit was filed on October 27, 1961, and defendant reconvened urging the invalidity of the agreement. In other words, defendant waited one year and five months before bringing up any question of nullity of the marital agreement, and this was done after he had ratified the agreement in many ways.
The agreement in this case is a very carefully drawn instrument of five typewritten legal pages. Defendant has ratified after the divorce almost every paragraph of that agreement which dealt with property settlement. It will serve no purpose to repeat the entire agreement and every instance of ratification. A few instances will suffice.
Under date of April 15, 1960, Mr. Tilton signed and returned in August a written act of ratification which ratified expressly certain transfers of property settlement agreement. Specifically, Mr. Tilton ratified the transfer of four pieces of real estate to his wife; the contents of the family home (with the exception of his personal goods); and a transfer of some shares in the Covington Country Club. Article 4 expressly ratifies the letter agreements of February 17th and March 8th. These letters set out in detail every item of the interspousal agreement *739 formally drafted and executed March 22nd in accordance with the terms of these letters.
In the agreement Mr. Tilton had agreed to transfer certain promissory notes to his wife and to guarantee unconditionally their payment. After the divorce he endorsed the notes "with recourse" and delivered them to Mrs. Tilton.
In the agreement Mr. Tilton promised to transfer certain savings bonds to his wife. After the divorce he took steps to procure the necessary government forms and did transfer these bonds to his wife.
Mrs. Tilton, with her ex-husband's knowledge, approval and consent, took over the payment of the monthly notes due on the real property acquired by her, as well as the taxes, insurance, and other expenses of maintaining the property, all according to the agreement.
These were other acts of ratification of the agreement which it will serve no purpose to list. Suffice to say that the above show a clear, definite and unequivocal ratification of the marital property settlement after the divorce such as would estop Mr. Tilton from urging the nullity of the agreement in question.
The defendant has raised the plea of no consideration moving toward him by the contract. Paragraph 9 of the agreement reads:
"The Wife accepts the provisions hereunder made for her in lieu of, and in full settlement and satisfaction of, any and all other claims and rights whatsoever which she ever had, now has, or might hereafter have against the Husband by reason of their relationship as Husband and Wife, or otherwise. It is the intention of the parties that except as otherwise provided herein, all liability of whatsoever nature on the part of the Husband to the wife, past, present and future, actual or potential, shall cease and terminate absolutely and forever."
Furthermore, the defendant did get some property from the agreement, albeit very little. As shown by the record, he was the initiating party and actually the agreement was conceived in his mind. He approved all of its provisions time and time again both before and after the divorce. Certainly it is odd for him to come into court now and say that he received no consideration for his own agreement. He received complete control of the Tilton Marine Company which was community property. Apparently this had been a profitable business and likely would have continued to be so except for Mr. Tilton's long periods of absence and neglect of his business as a direct result of the marital difficulties, which were of his own making. Certainly he knew how much this was worth and felt that it was of some value to him. It is hardly necessary to add that the primary consideration, the compelling motivation, which induced Mr. Tilton to propose the settlement and its terms, was his desire to secure a divorce in order to marry another woman as quickly as possible. Such consideration could hardly be evaluated in terms of material things. If he finds now that he has paid too dearly for that which he wanted, he has no one to blame but himself. The plea of lack of consideration has no merit.
Plaintiff alleged that defendant had breached the marital agreement in that he failed to pay certain community debts which existed on March 1, 1960, and she had to pay them. Paragraph 5 of the agreement obligates him to pay these community debts. Two of the debts which were not paid were a $103.00 tuition bill to St. Paul's College for a son's education and a $100.00 bill to a Dr. Crozat. The trial court awarded both of these sums to plaintiff.
In regard to the $103.00 bill owed to St. Paul's, plaintiff offered for proof of her payment a check stub dated February 22, 1960, showing the drawing of a $103.00 *740 check to St. Paul's College. This bill was paid with community funds before March 1, 1960. It, being a community debt and having been paid before March 1st, was not therefore outstanding on that date. Under the agreement, the defendant was obligated to pay community debts outstanding March 1st. The amount of the trial court's judgment will have to be reduced in this respect.
Plaintiff admitted on page 42 of the trial testimony transcript that she had assumed but not yet paid Dr. Crozat the $100.00 due him, therefore, she has no basis for claim against the defendant for this amount. This is a debt that he apparently still owes to Dr. Crozat. Unless and until plaintiff pays this debt, defendant does not owe her reimbursement on that account. The trial judgment will have to be reduced to the extent of this $100.00 Plaintiff's right to reimbursement if she has paid Dr. Crozat this amount is reserved.
Plaintiff also alleged in her petition that defendant had not reimbursed her a $300.00 rental payment which he was obligated to pay her under paragraph 4-H of the agreement. Defendant admitted on pages 25 and 26 of the trial transcript that he owes this money to plaintiff under the agreement.
Plaintiff seeks judgment against defendant on two promissory notes in the amount of $5,000.00 each which he guaranteed in the marital property agreement and which after divorce he endorsed over to her "with recourse." She has alleged that she has been unable to collect these notes. The trial court awarded a $10,000.00 personal judgment against the defendant on this basis. Since the defendant guaranteed payment of these notes in the marital property agreement and endorsed them, he is liable personally for their payment, but he is entitled to have the notes returned that he might attempt to secure payment from their respective makers.
These two notes were given to Mr. Tilton in payment for two-thirds of the stock of Air Conditioning Engineering, Incorporated, by C. F. Bankston and R. S. Hindelang, Jr., business associates of Mr. Tilton. This stock was an asset of the community estate. If it turned out to be of little value and an unwise investment on the part of Bankston and Hindelang, and if they have some defense as between them and Tilton, that is a matter for them to settle. This stock sale transaction never was fully consummated for the reason that Bankston and Hindelang became dissatisfied with the prospects of continued success of the business and alleged misrepresentations by Mr. Tilton to them of its financial condition. They never called for nor demanded delivery of the stock certificates which remained in the attorney's office. Shortly thereafter the business failed and the corporation became involved in litigation. Mr. Tilton nevertheless is contractually bound to make payment of this amount guaranteed by him in the marital settlement agreement, Article 4-B.
In paragraph 10 of the interspousal contract, which we have held was ratified, reference is made to certain insurance policies on the life of Mr. Tilton. These policies, in force at the time of the agreement, had a cash surrender value aggregating several thousand dollars. Some were already encumbered, being pledged to the National Bank of Commerce in Jefferson Parish as collateral for a loan. They were community assets and the debt a community obligation prior to March 1, 1960. The bank foreclosed on two policies held in pledge and the proceeds of surrender for cash value applied to payment of the note.
The marital agreement in Article 10 expressly excluded life insurance policies from the settlement, but provided:
"* * * It is agreed that neither Husband nor Wife shall surrender, pledge or otherwise alienate or encumber said policies or any one or more of them without the written consent of the other party; that in due course *741 Husband and Wife will agree to the final disposition of said policies; that if a mutually acceptable agreement is not reached within a reasonable time said policies shall be surrendered for their cash surrender values, respectively, and the net amount received shall be divided equally between Husband and Wife. In the interim, Husband shall pay all premiums that are due on said policies."
In a footnote on page seven of defendant-appellant's brief in this Court he says:
"* * * Forfeiture to the bank has since taken place and the net proceeds, after payment of the indebtedness, was by agreement given to one of the children. This amounted to approximately $300.00, which figure is also the net cash value actually realized by the parties. There is no evidence in the record as to the cash value of the policies on date of divorce or date of suit, but on page 1 of plaintiff's memorandum of authorities delivered to the lower Court, plaintiff volunteered that one-half of the net cash value of said policies was $4,029.30, and added one-half the annual increase in equity for years ending March 22, 1961 and March 22, 1962, which plaintiff volunteered was an additional $1,700.00. The lower Court included this purely volunteered $5,729.50 figure in its $19,132.30 judgment against defendant. In effect, the lower Court made a partition of the community policies, and erased the pledge-debt of June 18, 1959, contracted when the parties were happily married. The Court then included the policies in the interspousal agreement of March 22, 1960, which had specifically excluded them, and apparently charged the old June 18, 1959 debt entirely to defendant. The Court then gave one-half the full cash value and calculated increase to plaintiff, on a claim made in a memorandum of authorities without benefit of pleadings or evidence. The error is one of fact, law and procedure."
We cannot agree with defendant's above statement in its entirety. We have given serious consideration to this item of plaintiff's claim and except for the provision in Article 5 of the settlement agreement, and its subsequent ratification, we would deny plaintiff's right to claim any part of the cash value of policies already encumbered and later forfeited to satisfy a community debt. Article 5 obligates Mr. Tilton to pay the community debt owed the bank for which these policies were given as security. If he failed to pay that debt and the cash value of the policies forfeited on account thereof, he owes reimbursement to plaintiff of one-half their cash value at time of forfeiture.
Article 5 of the interspousal agreement was expressly ratified by the formal act of ratification dated April 15th, signed and returned by defendant in August, 1960. In this act of ratification reference is made in Article 4 to "The letter-agreement dated Feb. 17, 1960 and the acceptance thereof, dated March 8, 1960." The letter agreement includes in the nineteenth paragraph the following: "Except with respect to the notes that are secured by vendor's liens and mortgages on the real estate, you are to pay all of the community obligations." The entire letter is approved by Mr. Tilton at the end thereof. His letter of acceptance of March 8th says regarding this item: "19. Right. except household expenses for March and your fees."
We find the plaintiff to be entitled to one-half the proceeds from the surrender for cash value of certain life insurance policies under the terms of Article 10 of the settlement agreement. But we are unable to determine from the record before us exactly what the cash value was at time of trial below or if the parties had exercised their option under the terms of Article 10 to reach an agreement on the matter of disposition of these policies. For all we know, the parties might have elected not to surrender some or all of them but to continue them in force for the protection they provide. The testimony of their insurance *742 consultant, Mr. Dale Forshag, and the exhibits relating to insurance policies, (Exhibits A & B of the case record), are indefinite and inconclusive on this point. For example, Mr. Forshag testified on pages 130-138 of the transcript of testimony that the cash values on February 18, 1960, and at time of trial, were in regard to certain policies, "close approximations," "no way of knowing the exact value," "approximately $4,500.00." "Yes, sir. The cash valuenow, this is not an exact figure. If you wish, I can write the home office." He also testified regarding many variables which must be considered in computing actual cash value on any given date.
In this regard the only evidence before us upon which a specific judgment can be rendered relates to Travelers Insurance policy No. 2,581,712 for $10,000.00, surrendered for $1,312.70; and Home Life Insurance Company policy No. 620,471 for $22,000.00, surrendered for $3,278.00. These policies were held in pledge as security for a $4,000.00 note with the National Bank of Commerce, a community debt which the husband obligated himself to pay. The policies were surrendered in May, 1962, to satisfy this obligation. (Forshag, tr. of testimony, pages 132-133) The plaintiff is therefore entitled to judgment of $2,295.35 with legal interest thereon from May 31, 1962. We find nothing in the record to support the judgment of the lower court awarding to plaintiff the full amount of her claim on the item of insurance cash value. It must therefore be reduced accordingly with reservation of right to plaintiff to demand a further settlement of this item of her claim in accordance with the terms of Article 10 of the property settlement agreement.
We find the plaintiff to be entitled to judgment in accordance with the terms of the settlement agreement in the amount of $2,500.00 with legal interest thereon from date of judicial demand and $200.00 monthly from January 1, 1962, with legal interest on said amounts from the due date of each monthly payment, respectively, until paid, subject to credit for any payment thereon which defendant might have made since January 1, 1962.
We find no merit in defendant's plea of want of consideration, lesion and constructive fraud, and his petition in reconvention was properly denied by the trial court.
The defendant by his own volition and upon his own terms now finds himself in a position of great hardship. His once successful business is dissipated, his assets exhausted and the burden of his contractual obligations to his divorced wife very heavy indeed. But as we weep for the husband, let us reserve some tears for the wife and children. They too have paid dearly.
For the reasons assigned the judgment appealed from is amended by reducing the award to plaintiff to $12,800.00 with legal interest thereon from date of judicial demand, plus $2,295.35 with legal interest thereon from May 31, 1962, and plus $200.00 per month from January 1, 1962, with legal interest thereon from the due date of each monthly payment, respectively, less credit for any amount defendant might have paid since January 1, 1962. It is further ordered that plaintiff's rights to an accounting of cash surrender values of all insurance policies under the terms of Article 10 of the property settlement agreement of March 22, 1960, be reserved and the case remanded to the trial court for further proceedings on the issue of insurance cash surrender values consistent herewith. In all other respects the judgment appealed from is affirmed. The defendant-appellant is to pay all court costs.
Affirmed in part; amended in part; and remanded.