HAWTHORNE, Justice.
 

 Plaintiff-appellee, Mrs. Jeanne Jamison Lee, instituted this suit against her husband, Clarence O. Lee, from whom she was judicially separated, to have set aside an agreement for the settlement of the community which had existed between them.
 

 The trial judge after trial on the merits rendered judgment annulling and rescinding the agreement or contract entered into between these parties, and ordering that defendant make a true statement and accounting to the plaintiff of all properties belonging to the community of acquets and gains which had existed between them, and that plaintiff and defendant be recognized as the owners in indivisión, in the proportion of one-half to each, of all the property belonging to the community prior to its dissolution, and further ordering a true and correct inventory of all the property belonging to the community. From this judgment defendant, Clarence O. Lee, has appealed to this court.
 

 
 *437
 
 The appellee, Mrs. Lee, attacks the agreement settling the community which had existed between her and her husband on several grounds, one of these being fraud. She contends that the agreement was obtained through fraudulent representations and fraudulently withheld information, and, since we are of the opinion that this contention is well founded, it is unnecessary for us to discuss her other contentions.
 

 A careful consideration of all the evidence and testimony adduced during the trial of this case convinces us that the relationship of these parties, who were married on October 8, 1936, was unpleasant and not harmonious, and that plaintiff had made the statement on numerous occasions that she was going to leave her husband if their relationship did not improve. On July 18, 1946, the difficulties between these parties reached their zenith, and, due to the husband’s abuse and physical mistreatment of the wife, she left their common dwelling, taking with her to the home of friends her young son, born of her marriage to Clarence O. Lee, and some of her personal belongings. Mr. and Mrs. Lee have never become reconciled since the separation. A suit was instituted by the husband on or about August 1, 1946, for a separation from bed and board, and judgment was rendered decreeing such separation on August 9.
 

 On the same day on which the judgment of separation was rendered, an agreement or contract was entered into by these parties in which .it was stated that they desired to make full and complete settlement of the community of acquets and gains which existed between them, and for the purpose of effecting such settlement and partition the said Clarence O. Lee paid unto Mrs. Jeanne Jamison Lee the sum of $18,-000 cash, in consideration whereof Mrs. Lee conveyed, transferred, and delivered unto Mr. Lee all of her right, title, and interest in any and all the community property and the assets acquired during the marriage. On the trial of this case the district judge found — and we agree with his finding — that the community which had existed between these parties had a value in excess of $100,000 at the time of the separation.
 

 On July 19, the day following the night on which Mrs. Lee left the common dwelling, the defendant herein went to a safety deposit box in a bank in Baton Rouge and removed therefrom over 3500 shares of stock in various corporations, which had been purchased during the existence of the community for approximately $35,000, and sold them through the stock exchange for an amount in excess of $88,000, realizing a profit therefrom of over $52,000. On the same day he withdrew from banks in Baton Rouge, by means of checks made payable to C. O. Lee, Jr., his son by a prior marriage, large sums of money which allegedly belonged to the community — $1100 from the American Bank & Trust Company, $2000 from the Louisiana National Bank, and $375 from the City National Bank, or a total of $3475.
 

 
 *439
 
 A short time prior to the filing of the suit for separation from bed and board and prior to the settlement of the community, Mr. Lee falsely represented to his wife that he had lost from his person on the same day on which the various stocks were sold the proceeds thereof (which the record discloses amounted to more than $88,090). When his wife inquired about the sale of the stock, he admitted the sale, adding: "It is a funny thing — I lost that money before I got home.”
 

 Mrs. Lee frankly admitted that, at the time the settlement was made, she realized that she was not getting her full share of the community. She stated, however, that she had no idea of its true value or worth until requested in March, 1947, to sign income tax returns showing a very large community income for the year 1946, on which her portion of the tax amounted to more than one-third of the sum she had taken in full settlement of the community. In other words, she learned then for the first time that she was actually entitled to a much larger sum than that which, in her ignorance of the true value of the community property, she had accepted in the settlement. A short time after she saw this income tax return, she employed an attorney, and this suit was instituted.
 

 When Mrs. Lee signed the settlement agreement in August, 1946, her situation was a trying and even a desperate one. Shortly after she left the common dwelling and took refuge with friends, her husband permitted her to cash one check for $109, and this w-as apparently all the money she had. She stated that she had no home and no place to live. She knew that her husband had sold all the shares of stock and believed that, whether the money realized from these sales was actually “lost” as her husband asserted, it had been placed out of her reach and was “lost to her”. She knew that her husband would not voluntarily pay her alimony. She realized that he could and would mortgage the immovable property and place it beyond her reach. In her own words, she had “nothing to fight with.” She dreaded a protracted lawsuit and the publicity incident thereto, and believed she would lose in the long run by litigation. She endeavored to obtain the services of several different attorneys to represent her in a separation proceeding and in the property settlement, but due to her financial condition was unable to employ counsel.
 

 Her husband informed her that she could accept the $18,000 he offered her in full settlement of her interest in their property or resort to a lawsuit, which would avail her nothing, and, further, that, if she did not accept the $18,000 but tried to get more, she would end by getting an even smaller sum or nothing at all. Having been induced by her husband’s representations to believe that the sum of $18,000 was the largest amount which she could get as her share of the property, and believing that this sum would enable her to obtain some measure of security for herself and her
 
 *441
 
 young son, she acquiesced and signed the settlement agreement.
 

 We must bear in mind that the parties to this contract or agreement were not strangers dealing with each other at arm’s length, hut had the relationship of husband and wife to each other. Mr. Lee, as head and master of the community, was in a position to sell and dispose of the community property without the knowledge and consent of his wife. The property was under his supervision and control, and, with the advantage which this position gave to him, he practically, if not positively, coerced his wife to accept the settlement, knowing full well at the time that he had withheld from her the true value of the property belonging to the community and also knowing that she had been forced into a position, without the benefit of counsel, of accepting a settlement subject to his own terms. In our opinion, under the circumstances in this case the husband did not discharge his duty to deal fairly and justly with his wife.
 

 It is appellant’s contention that Mrs. Lee is not entitled to have the contract annulled and set aside on the ground of fraud unless her reliance on the false representations of her husband caused her to sign the agreement. He argues that she has failed to show that she relied in any way upon the representations of her husband, whether they were true or false, or that she was prompted to execute the contract because of her belief in the truth of Mr. Lee’s representations.
 

 This contention might merit our serious consideration if the parties to the contract were strangers to each other, but, since they are husband and wife, and since the husband by virtue of his superior position may compel his wife to settle the community for less than her share, this court will scrutinize such contract with the utmost care in order to ascertain whether he has coerced his wife by any circumstances into signing an unfair settlement agreement.
 

 As further evidence that Mr. Lee intended to defraud his wife out of her just proportion <pf the community and to prevent her from obtaining any additional amount other than the $18,000 previously paid, a little over a month before the present suit was filed, Mr. Lee executed a mortgage on certain movable and immovable property, allegedly belonging to the community, in the sum of $46,000 — the record discloses that this property was appraised at only a little more than $28,000 — and gave the note secured by this mortgage to his son, Clarence O. Lee, Jr., to whom he had previously given a large sum of money withdrawn from the banks in Baton Rouge on'the day after the separation, as pointed out hereinabove.
 

 In a supplemental petition Mrs. Lee prayed for and caused a writ of attachment to issue without giving bond as required by Article 245 of the Code of Practice. In the lower court defendant-appellant filed a motion to dissolve, which was overruled,
 
 *443
 
 and the judgment of the lower court from which he has appealed maintained this writ of attachment. Appellant takes the position that the trial court erred in maintaining the writ of attachment, and that it should he dissolved due to the failure of plaintiff to give bond.
 

 Under the plain terms of Article 245, a creditor praying for a writ of attachment must, among other things, give bond before the writ is issued. Furthermore, the remedy by attachment is an extraordinary one, dispossessing the party of his property, upon the ex parte showing of his oppoment, before his indebtedness is judicially ascertained. For these reasons it has been repeatedly held that the legal prerequisites must be fully complied with under pain of nullity. Erwin v. Commercial & Railroad Bank of Vicksburg, 3 La.Ann. 186, 48 Am.Dec. 447; Planters’ Bank of Tennessee v. Byrne, 3 La.Ann. 687.
 

 Appellee contends'that the question as to the validity of the writ is now moot under Article 266 of the Code of Practice, which provides that, if the debtor whose property has been attached has filed his answer, etc., the act of surety given by the plaintiff shall be cancelled as soon as judgment shall have been rendered in favor of such plaintiff. A reading of this article shows conclusively that it has no application here.
 

 For the reasons assigned, the judgment appealed from is reversed insofar as it maintains the writ of attachment. In all other respects it is affirmed and made the judgment of this court. Appellant is to pay all costs.