197 So.2d 619

**Mrs. Viola B. NELSON**

**v.**

**Mrs. Ruby P. WALKER.**

**No. 48359.**

March 27, 1967.

Rehearings Denied May 1, 1967.

Cecil N. Bankston, Baton Rouge, for appellee-applicant.

Sam J. D'Amico, D'Amico & Curet, Baton Rouge, for defendant-appellant-respondent.

HAMLIN, Justice:

In this suit seeking specific performance of an agreement to purchase certain real

property, 637 Royal St., north portion, Lot No. 4, Sq. No. 45, measuring thirty-two feet by sixty-four feet, Beauregard Town, Baton Rouge, Parish of East Baton Rouge, Louisiana, we directed certiorari to the Court of Appeal, First Circuit, in order that we might review its judgment in favor of Mrs. Ruby P. Walker, defendant, and against Mrs. Viola B. Nelson, plaintiff, which cancelled and annulled the contract of purchase entered into between them on August 27, 1964; ordered the return to defendant of $500.00 (with interest) deposited by her with the execution of the agreement; and awarded damages (attorney's fees) to defendant in the sum of $400.00, with interest, for the wrongful issuance of the writ of attachment. The principal effect of the judgment of the Court of Appeal was to reverse that part of the trial court's judgment which ordered defendant to comply with the provisions of the purchase agreement. 249 La. 754, 190 So.2d 914; La.App., 189 So.2d 54; Art. VII, Sec. 11, La. Const. of 1921.

Plaintiff contends that the Court of Appeal erred in: (1) holding the contract between plaintiff and her husband an absolute nullity incapable of ratification; (2) failing to hold the contract had been ratified; (3) holding plaintiff's title invalid

and reversing the trial court's judgment; and (4) reversing the trial court and awarding damages for wrongful attachment to defendant.

Defendant urges that she had reasonable grounds for refusing to perform under the purchase agreement, and that the decision of the Court of Appeal is correct and should be affirmed.

At the threshold of this decision, we shall discuss the question of whether plaintiff's title to the instant property was suggestive of litigation at the time defendant refused to comply with the purchase agreement.[1]

The agreement recited in part:

"* * * In the event the title is not valid, an additional 30 days time will be allowed the vendor to make the title valid and at his expense. If the title cannot be made valid in the 30 days time this contract shall be null and void and the deposit shall be immediately returned. * * *"

The facts of record reflect that on December 17, 1934, John Lee Brashear, then married but once and then to Viola Bankston Brashear, entered into a written contract under private signature with The Capital Building & Loan Association, Baton Rouge, Louisiana, whereby he agreed

---

1. In his reasons for judgment, the trial judge stated, "I see nothing in the record which is even slightly suggestive of litigation involving title to the property, and I am of the opinion plaintiff has a valid merchantable title thereto."

The Court of Appeal found that "the plaintiff's title to the subject property is not valid and merchantable."

to purchase the instant property for a consideration of $1800.00, and the Association bound and obligated itself to sell it to him. The contract recited that Brashear should make monthly payments of $22.00, commencing December 29, 1934, and that at his option title to the property would be passed when he had paid $900.00 on the purchase price, exclusive of interest. It was further agreed that Brashear should have the use and enjoyment of the property during the life of the contract, but only so long as he should discharge the obligations set forth. This agreement to purchase was not recorded.

On March 26, 1938, by authentic Act before W. G. Randolph, Notary Public for the Parish of East Baton Rouge, Louisiana, The Capital Building & Loan Association sold the property to Brashear for a consideration of $1,800.00, of which $300.00 had been paid in cash. A promissory note for $1,500.00, providing for monthly payments of $22.00, including taxes and insurance, was executed by Brashear in favor of the Association. The property was

described as being the northern 39 feet of Lot No. 4 of Sq. No. 45, measuring 39 feet on the east side of Royal St. by a depth of 64 feet. The Act recited that the property had been acquired by the Association at Sheriff's Sale in the suit entitled, "The Capital Building & Loan Association vs. Succession of Joseph S. Cothell," as per Sheriff's Sale dated November 24, 1934.[2] The Act by the Association to Brashear contained the usual warranty provision and was signed by both the vendor and the purchaser. It was recorded on March 28, 1938.[3]

A judgment of separation from bed and board was awarded Viola Bankston Brashear on April 5, 1944. As of the same day, John Lee Brashear and Viola Bankston Brashear entered into an Act of Partition of community property and settlement of alimony claim, by Act under private signature, acknowledged by Mrs. Brashear before R. S. Parker, Notary Public for the Parish of East Baton Rouge, on April 5, 1944, and acknowledged by Mrs. Brashear before Donald R. Brian, Notary Public for the Parish of Orleans, on April 13, 1944.[4]

2. The purchase agreement entered into by plaintiff and defendant recites measurements of "32 x 64." Earlier descriptions of the property had recited the lesser measurements.
3. John Lee Brashear testified that he moved to 637 Royal St. in about 1933, renting from an agency; that he entered into the purchase agreement and later surrendered the contract to purchase and took title to the property. He said his oldest boy died in 1939, and he left the

property sometime around 1940 or 1942; that he and his wife separated, and she bought his part of the property. He imagined she lived in the property after he left.
4. With respect to the act of partition of community property and settlement of alimony claim, Brashear gave the following testimony:
   "Q. I show you this document and ask you if you can identify it?
   "A. That's right, that's correct.

This Act recited in part:

"JOHN LEE BRASHEAR * * * does hereby and herewith sell, convey, grant, bargain, and deliver with all legal warranties, over and unto MRS. VIOLA BANKSTON BRASHEAR * * * all his rights, titles and interests of every nature and kind, being a one-half interest in and to the following property, to-wit:

"' * * * the North thirty-nine (39') feet of Lot Four (4), Square Forty-five (45), * * * measuring thirty-nine (39') feet front on Royal Street, by a depth of sixty-four (64') feet; * * *'

"The property hereinabove described is all of the community property belonging to the community of acquets and gains heretofore existing between the parties hereto.

"The property herein conveyed by said John Lee Brashear is *conveyed and delivered for and in consideration of the sum of One Thousand, Three Hundred ($1,300) Dollars,* lawful current money of the United States of America, *receipt of which is hereby acknowledged and full acquittance granted therefor; and for the further and other consideration of the said Mrs. Viola Bankston Brashear relinquishing, waiving and releasing any*

"Q. What is this document?
"A. That's the contract between my wife and me where I transferred the property over to her.
"Q. Do you recognize your signature?

*and all claims and rights to past, present and future alimony and/or support of her against her said husband;* the parties hereto having agreed and hereby · and herewith agreeing that for and in consideration of the property transfer herein made and in consideration of Mrs. Viola Bankston Brashear paying all costs in the separation suit hereinabove referred to, including the fees of her attorneys, *the said Mrs. Viola Bankston Brashear hereby acknowledging full, complete and entire payment and satisfaction of any claims which she now has or may have in the future for alimony or support against her said husband, and the said John Lee Brashear does hereby forever quitclaim, relinquish and renounce any and all claims which he now has or may have in and to the real property hereinabove described, and his interest therein being hereby and herewith conveyed unto the said Mrs. Viola Bankston Brashear.*

"* * *

"The property herein conveyed is transferred and delivered free of any outstanding indebtedness or encumbrances whatsoever. * * *

"All of the agreements and stipulations herein contained and all of the obligations herein assumed shall inure to the

"A. Yes, sir.
"Q. Do you recognize your wife's signature?
"A. Yes."

benefit of and be binding upon the successors and assigns of the respective parties hereto." (Emphasis ours.)

The foregoing agreement was duly recorded in the Clerk of Court's Office on April 19, 1944.

On April 18, 1944, Viola B. Brashear executed a cash sale of the property to The Capital Building & Loan Association for the consideration of $1,300.00. On the same day, the Association resold the property to Viola B. Brashear for $1,300.00, represented by a note payable in monthly installments of $13.00, plus taxes and insurance. A vendor's lien was granted. Both are authentic Acts before said W. G. Randolph, Notary Public, and were recorded on April 19, 1944.

Mrs. Viola B. Nelson (formerly Brashear) testified that she moved to this property in 1932 or 1933 and lived there until approximately 1945; that she owned the property at that time and all the way through until trial. She said she moved back to the property in 1959 and again left when she anticipated its sale. She affirmed that she bought her former husband's share of the property and borrowed the money from The Capital Building & Loan Association to pay him off. (See Acts of April 18, 1944, supra.) Mrs. Nelson further testified that she married Mr. Nelson approximately two years after her divorce from Mr. Brashear.

In considering whether plaintiff had acquired a valid title to the property in the partition agreement, supra, the Court of Appeal found that the provisions of LSA–C.C. Article 2446 clearly and definitely enjoin the use of any right of the wife against the husband as a consideration in dealing with the husband, and vice versa, except those rights with which they are expressly authorized to deal under the three circumstances enumerated in the Article.[5] The Court found also that it was against the public policy of this State and the express prohibitory law for the wife to alienate a right—alimony—owed to her by her husband and an obligation due by the husband to the wife.[6] The Court still further

---

5. "A contract of sale, between husband and wife, can take place only in the three following cases:
　"1. When one of the spouses makes a transfer of property to the other, who is judicially separated from him or her, in payment of his or her rights.
　"2. When the transfer made by the husband to his wife, even though not separated, has a legitimate cause, as the replacing of her dotal or other effects alienated.

"3. When the wife makes a transfer of property to her husband, in payment of a sum promised to him as a dowry.
　"Saving, in these three cases, to the heirs of the contracting parties, their rights, if there exist any indirect advantage." LSA–C.C. Art. 2446.
6. "If the wife has not a sufficient income for her maintenance pending the suit for separation from bed and board or for divorce, the judge shall allow her, whether she appears as plaintiff or defendant, a

found that plaintiff's waiver of the right to alimony in the partition agreement, supra, was an absolute nullity. With these findings, it relieved defendant of her obligation to purchase.

Counsel for defendant urges that the language in Russo v. Russo, 205 La. 852, 18 So.2d 318, was ample justification for the refusal to accept title to the property herein.

In the Russo Case, the facts disclose that subsequent to a judgment of separation from bed and board in favor of the wife, the parties entered into two agreements settling the community. For a consideration of $700.00 cash and payment of her attorney's fees of $150.00, the wife waived any rights she might have to present or future alimony. When the husband filed a petition for divorce, the wife brought two proceedings by rule to have the contracts set aside as being in contravention of Articles 1792, 1793[7] and 2446 of the Revised Civil Code. The wife neither returned the consideration she had received nor tendered its return. The trial judge dismissed plaintiff's rules, holding that she could not attack the validity of the contracts with-

out first returning the consideration. We granted writs, and after hearing we reversed the trial court, holding that return was not necessary under the particular facts; we remanded for further disposition of the matter. In the body of our opinion, we stated: "Consequently, insofar as a settlement of the community of acquets and gains is concerned both parties had the legal capacity to bind themselves. We have not been referred to any law of this State which grants to a married woman the legal capacity to bind herself in the settlement, renunciation or waiver of her right to alimony pendente lite." In speaking of Article 2446, we stated that nothing contained in the Article authorizes the wife to enter into a settlement or waiver of her right to alimony during marriage.

On remand to the trial court, Mrs. Russo was successful in having the contracts cancelled but was ordered to deposit $700.00 in the registry of the court, and her husband was ordered to pay her $25.00 monthly alimony. On appeal, this Court reversed those parts of the judgment which ordered the payment of alimony and the return of the $700.00 consideration. We found that the

---

sum for her support, proportioned to her needs and to the means of her husband." LSA–C.C. Art. 148.

7. "If the contract be reciprocal, it must not be enforced on one side only; and if the minor, or other incapacitated person, opposes his incapacity against any part of the agreement, the whole of the contract is void." LSA–C.C. Art. 1792.

"If, in a contract with an incapacitated

person, or in a contract void for want of form, entered into with any one for the benefit of such incapacitated person, any consideration be paid or given, and the contract be afterwards invalidated on account of such incapacity or want of form, the consideration so paid or given must be restored, if it was applied to the necessary use or benefit of the incapacitated person." LSA–C.C. Art. 1793.

wife did not need alimony, but that the $700.00 had been applied to her prior needs. 208 La. 17, 22 So.2d 671. In the body of our opinion, we stated: "An analysis of the evidence conclusively shows the wife never *ratified* these contracts following her divorce from the defendant. She pleaded their nullity prior to being relieved of her incapacity and there is nothing in the record to show that she ever altered her position in this respect either by her actions or otherwise. * * *" (Emphasis ours.)

LSA–C.C. Article 1786 provides that the unauthorized contracts made by married women, like the acts of minors, may be made valid after the marriage is dissolved, either by express or implied ratification. LSA–C.C. Article 1791 provides that persons who have treated with a married woman cannot plead the nullity of the agreement, if it is sought to be enforced by the party, when the disability shall cease. In LSA–C.C. Article 1795, it is stated that if a contract, made by a person incapacitated from contracting, shall be confirmed by him after his incapacity shall cease, the rights of third persons acquired before such confirmation are not impaired thereby, even if such rights were acquired with notice of the invalid act. An error in law, as well as error in fact, invalidates a contract, where such error is its only or principal cause. LSA–C.C. Article 1846. These Articles of the Civil Code are applicable to the present controversy.

Herein, Mr. and Mrs. Brashear were legally separated at the time they entered into the partition agreement. LSA–C.C. Article 2446, supra, neither prohibited the sale by Mr. Brashear of his share of the instant property to Mrs. Brashear, nor did it prohibit Mrs. Brashear from purchasing it. A reading of the partition agreement and the evidence of record impels us to conclude that the principal cause or consideration for the sale was the payment of $1,300.00 by Mrs. Brashear to Mr. Brashear. Mr. Brashear had left the former marital domicile, and Mrs. Brashear wanted the ownership of the whole of the property. The real estate belonged to the community of acquets and gains and, as recited in the Act of Partition, supra, constituted the community; it had been purchased in 1938 for $1,800.00, the same amount set forth in the 1934 agreement to purchase. Mrs. Brashear's payment of $1,300.00 to Mr. Brashear represented payment for his share of the community. His testimony, supra, confirms this fact. There is no evidence of record as to any enhancement in value of the property between 1938 and 1944, but it is self-evident that the amount paid by Mrs. Brashear was only $500.00 less than the original purchase price.

█ LSA–C.C. 2446 does not permit a wife to waive her right to alimony pendente lite granted to her by the provisions of

LSA–C.C. Article 148.[8] Insofar as the waiver of alimony was concerned, Mrs. Brashear was an incapacitated person and committed an error of law in waiving her right to that to which she might have been entitled according to circumstances. LSA–C.C. Article 1790.[9] However, as stated supra, we are constrained to conclude that this error was not the principal cause of their contract of sale. LSA–C.C. Article 1846, supra.

▆ We find that Mrs. Brashear's error in waiving her right to alimony pendente lite constituted a relative nullity. The nullity stemmed from an act in derogation of laws enacted for the individual's protection and was not in violation of public order or good morals. Cf. Succession of Delesdernier, La.App., 184 So.2d 37, 56. "This court has differentiated between absolute nullities in derogation of public order and good morals and those which are established

in the interest of individuals. The latter nullities are susceptible of ratification, either expressly or impliedly, and may be prescribed against, while the former are never susceptible of ratification and can never be prescribed. * * *" Whitney National Bank of New Orleans v. Schwob, 203 La. 175, 13 So.2d 782. See, Planiol, Civil Law Treatise, Vol. 2, Part 1, Arts. 1436, 1438, 1439, 1440. Cf. Lloyd v. Register, La.App., 184 So.2d 279; 249 La. 452, 187 So.2d 438.

▆ Mrs. Brashear's incapacity ceased to exist after her divorce from Mr. Brashear; she married Mr. Nelson approximately two years thereafter.[10] There is no evidence of record that she was *ever* in necessitous circumstances or that she was at any time a potential charge of the State. Likewise, there is no evidence that Mr. Brashear attempted to or defrauded Mrs. Brashear of her rights. Cf. Lee v. Lee, 214 La. 434, 38 So.2d 66; Pitre v. Pitre, 247 La. 594, 172

8. " * * * a judgment of separation of bed and board does not dissolve the marriage. It terminates the marital relationship and dissolves the community. It does not extinguish the obligation of fidelity and the duty of support and assistance provided for in Articles 119 and 120 of the LSA–Civil Code. The duty to support is enforced by law even after the separation of bed and board. * * *" Hillard v. Hillard, 225 La. 507, 73 So.2d 442.

9. "Besides the general incapacity which persons of certain descriptions are under, there are others applicable only to certain contracts, either in relation to the parties, such as a husband and wife, tutor and ward, whose contracts with each other are forbidden; or in relation to the subject of the contract, such as purchases, by the administrator, of any part of the estate which is committed to his charge, and the incapacity of the wife, even with the assent of the husband, to alienate her dotal property, or to become security for his debts. These take place only in the cases specially provided by law, under different titles of this Code." LSA–C.C. Art. 1790.

10. "Alimony judgment in its nature is such that a plea of res adjudicata would not prevail. It is lost if the wife contracts a second marriage, even after a divorce. Article 160, LSA–Civil Code. * * *" Hillard v. Hillard, 225 La. 507, 73 So.2d 442.

So.2d 693; 248 La. 925, 183 So.2d 307; 34 Tulane L.Rev., p. 30.

Mrs. Brashear accepted the benefits of the rental of the property after the partition agreement; she retained and exercised all benefits and advantages and assumed all incumbent obligations and liabilities; she also contracted to sell the property to defendant. At various times she occupied the property. Under such facts, we are constrained to find that she ratified the partition agreement and settlement of alimony claim and impliedly confirmed it after her incapacity ceased. Cf. Tilton v. Tilton, La. App., 162 So.2d 733; 25 La.L.Rev. 318; Dares v. O'Donnell, La.App., 151 So. 774.

We cannot differentiate between a married woman incapable of executing certain contracts and a minor incapable of contracting. Both can claim the nullity of their actions which took place during the time of their incapacity and disability. Therefore, if a major can ratify his relatively null actions which took place during his minority, it follows that a woman can ratify her actions which occurred during a period of marital incapacity. See, LSA–C.C. 1786.

Mr. Brashear accepted the $1,-300.00 cash consideration of the partition agreement. He has never voiced any objection to Mrs. Brashear's incapacity of 1944. His testimony expressed complete approval. Therefore, he likewise has ratified the partition agreement and cannot now, at a time when his former wife's disability has ceased, allege its nullity.

Having found that Mrs. Nelson's (Brashear) incapacity and disability became nonexistent and that she had ratified the partition of community property and settlement of alimony claim, we approach the question of whether she could convey a valid title to the instant property to a purchaser on August 27, 1964, the date of the present purchase agreement. Initially, we find that the defects assigned to the title by counsel for defendant and set forth in his letter of October 8, 1964 to counsel for plaintiff (which defects he alleges existed prior to Mr. Brashear's purchase on March 26, 1938) are not such defects as would produce invalidity. We do not feel it is necessary to burden this opinion with a copy of counsel's letter. Suffice it to say that in this lengthy letter, he made no mention of the act of partition of community property and settlement of alimony claim.[11]

11. There have been filed in evidence certified copies of authentic acts executed prior to the Sheriff's Deed to The Capital Building & Loan Association dated November 24, 1934; these deeds are dated February 24, 1925, August 26, 1920, April 29, 1920, and February 6, 1920. They are all translative of title and constitute links in plaintiff's chain of title. We do not deem it necessary to describe them here.

The trial judge stated in his reasons for judgment:

"On the suggested defects in her title to the property, plaintiff pleads the pre-

■ In 1964 ten years had elapsed since the date of cessation of Mrs. Nelson's (Brashear) incapacity. Ten years had also elapsed since the ratification of the partition agreement. Plaintiff and Mr. Nelson were married during the 1940's; the exact date is not disclosed by the record. The evidence of record discloses that plaintiff acquired the instant property in absolute good faith. Under the instant facts and circumstances, plaintiff acquired a just title. Cf. Pitre v. Peltier, La.App., 122 So.2d 867; Callahan v. Authement, La.App., 99 So.2d 531. Therefore, in 1964 plaintiff's title met the demands of Arts. 3474 and 3478.[12] In 1964 she was also prohibited by law from asserting the nullity of the agreement of 1944. LSA–C.C. Article 2221.[13] The act of partition was an act under private signature duly acknowledged by both Mr. and Mrs. Brashear and duly recorded. It, therefore, had the authority of an authentic act. LSA–C.C. Articles 2242 and 2246; Cf. LSA–C.C. Article 2440.[14] We conclude that in 1964 plaintiff's title to the property was good, valid, and merchantable, not suggestive of litigation, and she was able to convey it to a purchaser under an act translative of title.

Plaintiff filed suit on March 4, 1965. She alleged that on August 27, 1964, Mrs. Ruby P. Walker was a resident of the State of Mississippi and had appointed no agent for service of process within the State of Louisiana. Plaintiff prayed for the issuance of a writ of attachment upon her giving bond. The trial court issued the writ as prayed for, and, after due proceedings, an order was issued March 29, 1965, filed March 30, 1965, ordering the Union Federal Savings & Loan Association, garnishee, to deliver to the

scriptions of ten and thirty years. The evidence shows that plaintiff and her authors in title have had complete and undisturbed possession of the property since as early at least as the year 1933. Plaintiff herself has had possession of the property under a deed translative of title for twenty years.

"Without enumerating the several alleged defects in plaintiff's title, it suffices to say that in my opinion they are, even if once real defects, cured by the prescriptions of ten and thirty years which plaintiff pleads. * * * "

12. "Immovables are prescribed for by ten years, when the possessor has been in good faith and held by a just title during that time." LSA–C.C. 3474.

"He who acquires an immovable in good faith and by just title prescribes for it in ten years. * * * " LSA–C.C. 3478.

13. "In all cases, in which the action of nullity or of rescission of an agreement, is not limited to a shorter period by [a] particular law, that action may be brought within ten years." LSA–C.C. Art. 2221.

14. "An act under private signature, acknowledged by the party against whom it is adduced, or legally held to be acknowledged, has, between those who have subscribed it, and their heirs and assigns, the same credit as an authentic act." LSA–C.C. Art. 2242.

"Sales or exchanges of immovable property by instruments made under private signature, are valid against bona fide purchasers and creditors only from the day on which they are registered in the manner required by law." LSA–C.C. Art. 2246.

"All sales of immovable property shall be made by authentic act or under private signature." LSA–C.C. Art. 2440.

Sheriff of East Baton Rouge Parish, Louisiana, the $5,000.00 it had on deposit to the credit of Mrs. Ruby P. Walker. Previously, on March 17, 1965, an order was signed appointing an attorney to represent the absent defendant. The motion to appoint attorney for absentee (which is marked, "FILED MAR 18 1965") was filed by counsel for plaintiff and alleged that defendant had no known place of residence in the State of Louisiana.

Through her own counsel defendant filed a motion to dismiss the attachment, alleging that it had issued wrongfully in that plaintiff had seized property belonging to defendant's minor children in which she had no interest; she prayed for attorney's fees in the sum of $1,000.00 or more. Defendant later brought a rule to show cause why the attachment should not be dissolved, alleging that she had been living in Zachary, Louisiana, since January 18, 1965, and had purchased a home in that city.

Upon a hearing of the motion to dissolve, the trial court found that defendant owned at least an undivided interest in the deposit and denied the motion. The motion was later heard on the merits, and the writ of attachment was dissolved June 29, 1965, judgment being signed and filed July 15, 1965. In its reasons for judgment the trial court stated:

---

15. " * * * Attorney's fees for the services rendered in connection with the dissolution of the writ may be included as an

"In my opinion the facts clearly show that at least as early as January 18, 1965 defendant evidenced her intention to acquire a permanent residence in this parish; that she did acquire such permanent residence; and that she was domiciled in this parish on March 5, 1965, the date on which this suit was filed. * * * For these reasons the writ of attachment will be dissolved.

"Although defendant prayed for attorney's fees for the dissolution of the writ, she has not urged this demand. Considering the unusual circumstances here, it is my opinion no such award is justified."

The Court of Appeal found that defendant was entitled to be awarded attorney's fees under the provisions of LSA–C.C.P. Article 3506.[15] It stated:

"This expense to her was provoked by the unlawful and unwarranted application for the attachment by the plaintiff. We believe this to be the only element of damages shown by the defendant. She is awarded the sum of $400, as attorney's fees."

■ We conclude that the judgment of the Court of Appeal awarding defendant damages in the sum of $400.00 for attorney's fees is correct. The Court of Appeal found, as did the trial court, that the writ of

---

element of damages whether the writ is dissolved on motion or after trial on the merits." LSA–C.C.P. Art. 3506.

attachment was illegally obtained. The services of an attorney were required for the dissolution of the writ, and, considering that the amount attached was $5,000.00, we do not find that an award of $400.00 is excessive.

For the reasons assigned, the judgment of the Court of Appeal, First Circuit, insofar as it allowed defendant damages in the sum of $400.00 for attorney's fees, is affirmed. In all other respects, the judgment is reversed. The judgment of the trial court, which ordered specific performance by defendant of the purchase agreement of August 27, 1964 entered into between plaintiff and defendant, is affirmed and reinstated. Costs for the dissolution of the writ of attachment are to be borne by plaintiff. All other costs are to be borne by defendant.

HAMITER, J., concurs in the result.

197 So.2d 628