387 So.2d 1206 (1980)
Robert Cyce LEWIS, III
v.
Edna Ann Monday LEWIS.
No. 13397.
Court of Appeal of Louisiana, First Circuit.
June 9, 1980.
Rehearing Denied September 4, 1980.
P. David Carollo, Slidell, for plaintiff, appellant.
Jacqueline Carr, Slidell, for defendant, appellee.
Before COVINGTON, LOTTINGER and COLE, JJ.
LOTTINGER, Judge.
The plaintiff-husband brought this suit for divorce and the defendant-wife reconvened, claiming that a post-separation community property settlement was invalid because she had been threatened into signing it by her husband. The validity of the settlement is the sole issue on appeal. From a judgment nullifying the community property settlement, the plaintiff-husband has appealed.
*1207 The Lewises were legally separated on November 7, 1977, in a judgment rendered in favor of Mrs. Lewis on the grounds of cruel treatment. On December 23, 1977, the Lewises entered into a community property settlement, authentic in form, to settle and liquidate the community of acquets and gains. An authentic "Act of Correction" dated January 24, 1978, was later signed, and both documents were recorded in the St. Tammany Parish clerk of court's office on January 25, 1978.
In the community property settlement, Mrs. Lewis received a 1974 automobile, all her personal belongings, a television set, certain household appliances, and $10,000.00 payable in $400.00 monthly installments, with the balance due at the time of the final divorce. Mr. Lewis assumed all the community debts and agreed to hold Mrs. Lewis harmless from all the debts. Mr. Lewis also received certain immovable property owned by the community, some of which was apparently used to stable horses owned by Mr. Lewis and other persons who rented stalls from him. In the act of correction, Mrs. Lewis received one registered quarter horse in return for her signing over to Mr. Lewis three businesses operated by him-Lewis Feed and Tack, Lewis Stables, and Lewis Trailer Sales.
On April 12, 1979, Mr. Lewis brought this suit for divorce based upon living one year separate and apart following judgment of separation without reconciliation. La.R.S. 9:302. The wife answered on April 26, 1979, and reconvened, claiming the community property settlement had been signed by her under duress and fear for her life. She also claimed the settlement was invalid because of lesion beyond moiety and because she was not represented by an attorney, but these claims were dismissed during trial. Mr. Lewis generally denied the allegations of threats and duress.
Mrs. Lewis testified that most of the threats against her regarding the community property settlement were made before she moved to Shreveport from her Slidell home. She said her husband also threatened her once over the telephone. She said Mr. Lewis's threat was that if she did not sign the community property settlement and peacefully accept what she received in the settlement, she "would be taken care of."
Both documents relating to the community property settlement were prepared by Mrs. Lewis's attorney and mailed to her in Shreveport, where she signed them out of the presence of her husband, who retained the family residence in Slidell.
She explained that she felt forced to sign the documents because her husband told her he would quit sending her money until she signed. Jobless and with a young child to raise, Mrs. Lewis said she had no other choice but to sign the agreements. She admitted, however, that her husband had sent her a number of checks timely before the community property settlement was prepared and signed; that her husband never visited her in Shreveport, nor bothered her there; and that her husband never interfered in her request to see her son, who was living with the husband.
Mrs. Lewis also testified she was "scared to death" of her husband. She said the separation judgment was based on cruel treatment because her husband beat her, cursed her in front of others and slapped her around. Mrs. Lewis did not know whether her husband would carry out the threats, but she apparently concluded that he would not because he had made the threats in front of so many other people:
"At the time [of the threats] I thought he would [carry out the threats], but when I thought about it, that he said it in front of so many people, I didn't think he would."
Nevertheless, she added: "Right now, I'm afraid of him."
Two close friends of both of the Lewises testified that Mr. Lewis had a short, easily aroused temper. One witness, said he heard Mr. Lewis threaten Mrs. Lewis, but only out of her presence. He added, too, that he never heard any threats made concerning the community property settlement. Another witness said she heard Mr. Lewis threaten Mrs. Lewis regarding the community *1208 property settlement, but she did not know what community property settlement was being referred to. She admitted on cross examination that the "threats" were made during a husband/wife argument, and that Mr. Lewis did not actually threaten to kill his wife.
Mr. Lewis testified that if he ever said his wife would be taken care of, he only meant he would take care of her financially. He said that though he and Mrs. Lewis had numerous arguments, he never intended to inflict bodily harm upon her. He said he never denied her any money and never bothered her in Shreveport. He was never arrested for threatening his wife or for any other offenses against her.
James R. Strain, Jr., the attorney who drafted the community property settlement, said that he always considered himself to be Mrs. Lewis's attorney, and that he refused to answer Mr. Lewis's questions without Mrs. Lewis's consent. Strain said Mrs. Lewis never told him she was forced to sign the community property settlement. On the contrary, the document was discussed at length between the parties before it was signed. "In my conferences with Mr. Lewis and Mrs. Lewis, she never indicated in her actions, mannerisms, or questions that she was in any way duressed or forced." Not until three to six months after the documents were executed did Mrs. Lewis complain to Mr. Strain about the amount of money she had received in the settlement.
In oral reasons for judgment, the trial court accepted the testimony of Mrs. Lewis and her two witnesses concerning the alleged threats, and concluded that Mrs. Lewis had been coerced into signing the documents. He ruled that the documents should be rescinded since Mrs. Lewis's consent was not freely and voluntarily given.
The law governing the rescission of contracts because of consent induced by violence or threats is found in Articles 1850 and 1851 of the Louisiana Civil Code of 1870.
Article 1850 provides:
"Consent to a contract is void, if it be produced by violence or threats, and the contract is invalid."
Article 1851 states:
"It is not every degree of violence or every kind of threat that will invalidate a contract; they must be such as would naturally operate on a person of ordinary firmness, and inspire a just fear of great injury to person, reputation or fortune. The age, sex, state of health, temper and disposition of the party, and other circumstances calculated to give greater or less effect to the violence or threats, must be taken into consideration."
Exactly what standard courts are to apply to determine whether violence or threats have vitiated consent to a contract is difficult to determine, given the apparent contradictory standards in Article 1851. The first sentence of Article 1851 lays down an objective standard: Only that degree of violence or those types of threats which would lead a person of "ordinary firmness" into fearing great harm to person, reputation or property will be found to undermine his free and voluntary consent. The second sentence, however, requires courts to give weight to the subjective characteristics of the individual who claims his or her consent was coerced by violence or threats. Among these characteristics are age, sex, state of health, temper and the situation of the party.
In the few Louisiana cases which have interpreted this article as it applies to contracts between husband and wife, the courts seem to have placed greater weight on the subjective characteristics listed in Article 1851. In a case involving fraud against the wife in a community property settlement, the Louisiana Supreme Court said it would scrutinize community settlement contracts "with the utmost care" to determine whether the husband coerced the wife "by any circumstances into signing an unfair settlement agreement." Lee v. Lee, 214 La. 434, 38 So.2d 66 (La.1948), at 69.
In Succession of Smith v. Smith, 23 La. Ann. 240 (1871), the husband threatened to kick the wife out of the home unless she *1209 relinquished her first mortgage in favor of the second mortgagee on property belonging to the husband's mother. The court invalidated the relinquishment because of the husband's threats. The fact that the threats were made to the wife privately did not weaken the wife's testimony as to duress and coercion. The court found that such threats are not likely to be made in public because publicizing them would likely defeat their purpose.
The husband in Vicknair v. Trosclair, 45 La.Ann. 373, 12 So. 486 (La.1893), threatened to leave the wife and her children unless she signed over her one-eighth interest in property to one of the husband's friends. Immediately after signing, the friend conveyed the property to the husband, who later exchanged the entire piece of property for another piece of property burdened by a mortgage. The court invalidated the sale because of the coercion and influence exercised upon the wife by the husband. The court noted that the wife received nothing as a result of the sale, whereas the husband stood to benefit by the series of transactions. The Vicknair court, like the court in Smith, gave little weight to the fact that the husband's threats were made in private to the wife.
Mollere v. Harp, 36 La.Ann. 471 (1884) involved a case in which an uncle threatened to kill his nephew unless the nephew allowed the uncle to be a partner in the nephew's business and unless the nephew further settled the pretended partnership. Because of the uncle's "savage disposition" and the "terrible dilemma" in which the nephew was placed by the uncle's threats, the court invalidated the settlement confected by the nephew and uncle. The Mollere court, too, also seemed to place great weight on the subjective characteristics of the nephew.
The only case cited by counsel for appellant in support of his contention that the trial judge incorrectly invalidated the contract is Wilson v. Aetna Casualty and Surety Company, 228 So.2d 229 (La.App. 3rd Cir. 1969). There, an illiterate 66-year-laborer who was severely injured in an automobile accident settled his personal injury claim with the insurance company for $5,000.00. Thereafter, the plaintiff was awarded some $16,600.00 by a jury for the injuries he received. The trial court allowed the jury award to stand by invalidating the release, holding that the plaintiff was induced into signing the release because of his intolerable physical and financial circumstances. The appellate court reversed, finding that lack of bargaining power and strong economic duress are not grounds to rescind a compromise under Article 1851. The duress contemplated by Articles 1851 through 1853 "is that which proceeds from a fear of force or violence which wipes out freedom of consent; it connotes an actor performing an exterior act which gives rise to the duress, rather than the entire set of objective circumstances causing the victim to act as he does." 228 So.2d at 232. The court further noted that the bad advice of a third party or a stranger is, by itself, insufficient to invalidate the consent of a party to a contract. The Wilson court apparently found that there was only a fear of economic problems which led the plaintiff to sign the release and not a fear of force or violence being used against the plaintiff to exact his consent.
French commentators looking at a similar provision in the French Code Civil (Art. 1112) have also noted the apparent inconsistency in the standards for determining whether a contract should be vitiated because of violence or threats. See Aubry & Rau, 1 Civil Law Translations, Obligations, § 343a; and Planiol Civil Law Treatise, Volume 1, Nos. 277, 278 and Volume 2, Nos. 1070, 1072 (LSLI Translation, 1959).
Planiol felt that the use of subjective qualities in deciding whether a person has been forced into consenting to an obligation destroys the objective standard. This is so "because instead of determining the violence according to the impression it would make on a reasonable person, it appreciates its effect in a concrete manner on a child or an old man, on a woman, on a dumb or an ignorant person." Civil Law Treatise, Volume 2, No. 1072.
*1210 Despite the apparently inconsistent standards in Article 1851, our goal is to attempt to reconcile the standards without emasculating either one. The redactors of the code probably realized that applying an objective standard to all situations could result in an injustice to those individuals who sincerely fear they will suffer great harm if they do not consent to an obligation, but whose fear would not be shared by a person of ordinary firmness. This may be the reason the redactors added the subjective qualities to the objective standard of Article 1851. On the other hand, the redactors probably felt that a defense based on threats or violence should not be taken lightly because of the relative ease with which a person can claim he or she has been forced into agreeing to a contract. This may have been the reason for giving Article 1851 its predominately objective flavor. As a compromise, the redactors adopted both standards, and a proper interpretation of this Article must necessarily focus on objective and subjective characteristics. This can be done by first determining the subjective characteristics of the individual who claims he or she was forced by violence or threats into agreeing to a contract and then deciding whether other reasonable persons with the same subjective characteristics would have felt forced into signing the contract under the same type of threat or violence.
In the case at bar, the wife, whose age was not in the record, was separated from her husband on the grounds of cruel treatment. A meager amount of evidence indicated some physical cruelty was involved. At the time she signed the agreement, the wife was living in Shreveport many miles away from her husband. She admitted she was in fairly dire need of money. The wife and two witnesses testified that the husband threatened to "take care of" the wife if she failed to sign the community property settlement. But the same two witnesses admitted either that the threats were not made in connection with the community property settlement or that the threats were made during a normal husband-wife argument in the presence of other persons. And even the wife could not testify to any degree of certainty that she felt her husband would carry out his threats. At one point in her testimony, Mrs. Lewis claims that it was not necessarily the fear of violence but the lack of money which caused her to sign the documents. As noted previously, there is no evidence in the record to show that Mrs. Lewis was unfairly treated in the settlement agreements.
We find that, under this set of circumstances, a reasonable person with the subjective characteristics of Mrs. Lewis would not have felt forced by violence of threats into signing the community property settlement upon which this suit is based. We realize that the trial judge in matters of this nature must, of necessity, be given great discretion. He alone observes the witnesses and notices their demeanor. The trial judge in this case chose to believe the testimony of the wife and the two witnesses in finding that Mrs. Lewis had been coerced by threats of violence to sign the community property settlement. The facts as presented above, particularly the fact that Mrs. Lewis received $10,000.00 in the settlement and the fact that she signed the settlement in Shreveport, lead us inexorably to the conclusion that the trial judge was clearly wrong in his determination. Mrs. Lewis has presented no evidence that the settlement was lesionary. In fact she abandoned such a claim at trial. Her basic complaint, it seems, is that she signed the settlement because she was in need of money. The court in Wilson, under circumstances of duress which seem much more severe than those in this case, found that strong economic duress, by itself, was insufficient to vitiate the consent given to an otherwise valid contract. We feel the same rule must be applied in the case of the community property settlement between the husband and the wife.
Therefore, for the above and foregoing reasons, the decision of the trial court is reversed and the defendant-wife's claim is dismissed. The appellee will pay the costs of this appeal.
REVERSED AND RENDERED.