962 So.2d 1137 (2007)
Edith Dewitt WILKERSON, Plaintiff-Appellant
v.
James Clyde WILKERSON, Defendant-Appellee.
No. 42,324-CA.
Court of Appeal of Louisiana, Second Circuit.
August 15, 2007.
*1139 Dimos, Brown, Erskine, Burkett & Garner, L.L.P. by Donald R. Brown, Alexandria, for Appellant.
Mulhearn and Smith by Leroy Smith, Jr., James E. Paxton, Tallulah, for Appellee.
Before WILLIAMS, CARAWAY and DREW, JJ.
CARAWAY, J.
In this community property partition action, the wife appeals the portions of the partition judgment by the trial court which valued an unexpired sublease, set reimbursement for the income generated by the sublease operations from 1999-2004 and classified the community property interest in an equipment corporation. Finding merit to a portion of appellant's claims, we amend the judgment in part and affirm.

Facts
After 37 years of marriage, Edith Wilkerson instituted divorce proceedings against her husband, James, on September 1, 1999. The divorce became final on August 7, 2000, and terminated the community property regime retroactive to the date of the divorce petition. On April 17, 2001, James sought partition of the parties' substantial former community properties. James engaged in the business of farming and Edith did not work outside of the home.
To assist in partitioning the property, the trial court appointed notary/special master (hereinafter "Special Master") Charles Traylor to obtain agreements or appraisals pertaining to the community property and make findings of fact.[1] The *1140 court further empowered the Special Master to file a written report with supporting documentation of his findings and recommendations for resolution of all community property disputes so as to effect the partition.
Both parties filed Sworn Detailed Descriptive Lists describing assets and liabilities of the community. Included within the sizable assets of the community and relevant to the issues raised on appeal was a sublease for property known as Ione Plantation (hereinafter the "Sublease"). The income attributable to operations from that property after the termination of the community was also listed. In 1997, by virtue of the Sublease, James obtained possession of the property for a term commencing November 1, 1997, and ending November 1, 2012. James was obligated to pay yearly cash rental together with 1/8th of the gross proceeds of the crops produced. Although the lease was basically agricultural, James also operated a hunting club on a majority of the plantation acreage and received rentals from participants. Farming took place on the remaining 252 acres that were cleared.
After the conclusion of the Special Master's report, a dispute arose over his conclusion that the parties had stipulated the value of the remaining term of the Sublease. There was also conflict over the Special Master's determination of the income produced by farming and hunting operations from the time the community was terminated through 2003. Both of these issues are now the subject of Edith's appeal.
Also included in the community was the couple's ownership interest in an equipment corporation known as J & C, Inc. In 1994, James transferred a substantial amount of farm equipment acquired during the marriage to J & C, Inc. ("J & C"), in consideration for the assumption of indebtedness owed on the equipment. J & C stock was issued equally to James and his son, James Clifton Wilkerson ("Cliff"). Income was received by the corporation from rentals of the equipment to another family entity.[2] This income was used to satisfy equipment notes and remunerate both James and Cliff. On February 22, 2002, Cliff transferred all of his shares of J & C to his father after they ceased farming together. Nothing was paid for this stock transfer as James simply assumed the liability for the equipment indebtedness.
At trial, Edith argued that the entirety of J & C was the parties' community property, since the 1994 transfer of the equipment into the corporation was, in effect, an unauthorized donation to Cliff. The trial court rejected that contention and instead viewed only one-half of the corporation as owned by the community. Edith also appeals this ruling.

Discussion

I.
The Special Master and the trial court were required to appraise the Sublease from two perspectives. First, the remaining term of the Sublease was the community asset which, under La. R.S. 9:2801(A)(4)(a), was to be appraised as of the time of trial. Next, the income or civil *1141 fruit that had accrued from the operations of the Sublease had to be accounted for between the co-owners from the time of the termination of the community in 1999 until the time of trial. In this case, James, who had farmed and operated the Sublease, owed an accounting of the income and reimbursement to Edith.
Edith now asserts that by judicial admission the parties resolved and settled the dispute regarding the value of the remaining term of the Sublease from 2004 through 2012. She also disputes the amount of Sublease income for the years 1999-2003 determined by the trial court.
Judicial Admission
The alleged judicial admission arose out of the process leading to the report of the Special Master. La. R.S. 13:4165 provides that a special master may make findings of fact and shall exercise the power to regulate all proceedings before him. In this case, the Special Master was charged with that task and invested with that power by order of the trial court in April 2002. The order further directed the parties to "either agree on stipulations of value or select by mutual agreement" appraisers for the properties.
On July 2, 2003, Edith filed her amended detailed descriptive list of the community property and reimbursement claims in which she listed the Sublease as a community asset with a $500,000 value. She also made a separate claim for income from the farm and hunting club. James responded with his detailed descriptive list in which the Sublease is claimed to be his separate property with no value. Alternatively, conceding the possibility of community property, he claimed reimbursement for expenses and his labor from the operations of the Sublease.
In March 2004, the parties reached an apparent agreement for a $250,000 value for the Sublease. The only written statement of the agreement initially appears in a letter from Edith's counsel to James' counsel which stated:
My client has authorized me to inform you that she is willing to sell her undivided one-half interest in and to the remaining term of the sublease concerning Ione Plantation to you client for the sum of $125,000. . . .
(Emphasis added).
James later formally acknowledged this agreement in a lengthy pleading presented to the Special Master listing James' total claims and his proposed division of the community (hereinafter the "Submission Pleading"). The pleading expressly referenced the attorney's prior letter regarding the $250,000 total value of the Sublease. Although undated with no filing date shown below the caption of the suit, this Submission Pleading was received in evidence in the trial of the case before the trial court, and James does not dispute that the pleading was presented for the Special Master's deliberations for the partition.
On February 15, 2005, the Special Master filed a report with the court detailing his recommended partition of the Wilkersons' community property. The report acknowledged:
During the course of approximately two years, the parties have gathered information and made submissions to the undersigned for consideration of this project. In preparing this report I have relied primarily on the submissions the parties have made since they were deposed on February 16, 2004, but I have also examined and considered all of the materials they have provided.
In relevant part, the Special Master stated the following: "The parties agree that among the community assets is a lease of Ione Plantation. They further agree that the lease should be valued at $250,000 and allocated to James." Thus, the Special *1142 Master employed in his overall partition of the community a $250,000 value for the unexpired term of the Sublease. Additionally, the Special Master calculated the net income from the Sublease between 1999 and 2003 to be $116,553, allowing Edith reimbursement for $58,277.
The procedural process requires that after a report by a special master, the parties be given a right to traverse and object to the findings. "After a contradictory hearing, the court may adopt the report, modify it, reject it in whole or in part, receive further evidence, or recommit it with instructions." La. R.S. 13:4165(C)(3). This traversal process began in the spring of 2005, setting up the matters ultimately tried before the district judge. Significantly, in James' initial traversal, he did not object to the Special Master's employment of the $250,000 asset value for the Sublease but objected only to the conclusions regarding his accounting/reimbursement obligation for the income from the Sublease.
A month before trial, in a reversal of his prior submission, James made the following statements in a supplemental traversal:
Further, James C. Wilkerson offered to pay Edith $125,000.00 for the remaining 13 year term of the lease on Ione which completely reimbursed her for any claims resulting from the Ione lease, which offer was accepted. Therefore, there was an offer and acceptance and the issue as to any claims to Ione should be res judicata because he agreed to purchase her interest in the lease for $125,000.00 and any income or expenses from September 1, 1999 forward would be the separate property of James C. Wilkerson and she should not be entitled to any reimbursement claims for the income or expenses of Ione the same being at the sole risk of James C. Wilkerson.
At trial, the parties did not contest the classification of the Sublease as community property or its allocation to James. Edith argued, however, that an agreement had been reached between the parties as to the value of the unexpired term of the Sublease from 2004 forward. Nevertheless, the trial court allowed James' traversal of the Sublease's value and considered the parties' testimony in an effort to determine whether they had reached a compromise. Based upon the evidence presented at trial, the trial court concluded that there existed no meeting of the minds between James and Edith as to the complete details regarding the valuation of the Sublease. The court valued the unexpired Sublease as of the time of trial at $163,000.00 and determined the net income received by James from 1999 through 2004 to be $121,523.78.
A judicial confession is a declaration made by a party in a judicial proceeding. That confession constitutes full proof against the party who made it. A judicial confession is indivisible and it may be revoked only on the ground of error of fact. La. C.C. art. 1853; Cichirillo v. Avondale Industries, Inc., 04-2894 (La.11/29/05), 917 So.2d 424. Under this article, a declaration made by a party's attorney or mandatory has the same effect as one made by the party himself. La. C.C. art. 1852, Official Revision Comment (b). Admissions in pleadings fall within the scope of judicial confessions and are full proof against the party making the admission. Smith v. Board of Trustees of Louisiana School Employees Retirement System, 398 So.2d 1045 (La.1981). Likewise, a stipulation has the effect of a judicial admission or confession which binds all parties and the court. Lewis v. City of Shreveport, 36,659 (La.App. 2d Cir.12/11/02), 837 So.2d 44. An exhibit introduced at trial has been held to qualify as a judicial confession. *1143 Huval Baking Co. v. State, Worker's Compensation Second Injury Fund Bd., 594 So.2d 1028 (La.App. 2d Cir.1992).
Our law regarding judicial confessions during a legal proceeding is distinguished from the law of compromise of disputes outside of court by the parties. The trial court's view of this issue solely in terms of a possible party compromise misses the import of the special master judicial proceeding and the principles of judicial confession. This was not foremost a search for the parties' meeting of the minds outside the judicial process. What occurred by James' Submission Pleading settled in the mind of the court-appointed finder-of-fact the value of the Sublease, leaving only the remaining attendant problem of the accounting for prior income. There was clear demarcation by James in the Submission Pleading of the value of the remaining nine-year term of the Sublease (2004-2012) and the reimbursement claim addressed separately in the pleading for the years 1999 through 2003. There is no room for error of fact given the history of how the parties consistently addressed both aspects of the Sublease dispute. The Special Master understood the Submission Pleading as the clear and unambiguous judicial confession which it represents.
Particularly, with the give and take of a complex and extensive community property partition process, a party should not be allowed to withdraw prior incremental concessions and stipulations made within the process leading to the property division and accounting. The income accounting dispute for the Sublease had always been recognized by the parties, and neither party was fully satisfied with the Special Master's initial judgment in that matter. Yet, as that issue and others were traversed and properly appealed to the trial court, James should not be heard to withdraw his prior judicial confession of the value of the remaining term of the Sublease.
Accordingly, the trial court's finding of $163,000 as the value of Sublease utilized for the overall partition is amended to $250,000.
Sublease Income 1999-2003
The trial court valued the net profits of the Sublease from September 1, 1999, through 2004 at $121,523.78. Because we have now found merit to Edith's contention that James judicially confessed the prospective value of the Sublease in early 2004, we recognize that the 2004 income loss of $16,827.70 determined by the trial court should be excluded from the calculation of the Sublease income. Thus, we adjust the trial court's income calculation to include only the years 1999-2003 for a total of $138,351.48. From this amount, Edith's reimbursement will total $69,175.74. The judgment will be amended to reflect this recalculation.
In addition to this determination of income by the trial court, Edith claims that the award must be increased because of the improper expense calculations of James' expert which the trial court employed in its ruling. She contends that James failed to present adequate proof of the subject expenses and that the method utilized by James' expert produced inequitable results. Edith requests that the sum of $85,886.64 be added back into the income calculation and that she be awarded one-half of that amount.[3]
David Richardson, James' expert, utilized an average approach method to calculate certain farm expenses. These included *1144 items such as truck expenses, shop supplies, diesel, gas, oil, payroll taxes, workers' compensation expenses and repairs. At trial, Richardson explained the average approach method he utilized in calculating these actual costs of farming the Sublease. He testified that this method utilized a calculation of all expenses incurred by James in his total farming operations on the Sublease lands and other family acreage. The total sum of expenses was then divided by the total acreage farmed by James. This average cost per year was then multiplied by the 252 acres farmed on the Sublease to arrive at a cost per acre amount. Other expenses specific to the Sublease were also apparently included in Richardson's overall expense calculation.
Regarding the subject 2000-2003 cost calculations, the trial court made the following statements in partially accepting the methodology and calculations presented by Richardson:
Thus, the Court does not believe that an "average approach method" is acceptable regarding the attendant costs concerning labor for the reasons stated and therefore disagrees with Richardson's calculations in arriving at a net profit for Ione's farming operations in this respect. However, the Court does embrace the "average approach method" regarding the remaining farming expenses unless otherwise noted including the actual wages of the employees and has taken these expenses in consideration to arrive at appropriate net profits.
In the final computation of expenses, the court removed certain expenses from Richardson's average approach expense calculations, but otherwise accepted his numbers.[4]
Overall, Edith's expert, David Johnston, did not contest the majority of expenses listed by Richardson. He felt the better valuation method was to place the expenses of the operations on the family entities that actually incurred them. Thus, he prepared his expense schedule only from the expense data actually identified with the Sublease. He admitted that his numbers did not reflect the actual cost of production from the Sublease acreage and that if he were going to buy the farm he would want to know specifically what was spent. He also agreed that in this case, he would have to consider the other family corporations to determine actual costs. Johnston agreed that the average approach method "in theory" would be "a reasonable method" of calculating actual expenses.
In community property partitions, the trial court is granted much discretion in valuing and allocating assets and liabilities and is required to consider the source and nature of each asset or liability, the financial situation of the other spouse, and any other relevant circumstances. La. R.S. 9:2801 et seq.; Roan v. Roan, 38,383 (La.App. 2d Cir.4/14/04), 870 So.2d 626; Bedenbender v. Bedenbender, 28,579 (La. App. 2d Cir.8/21/96), 679 So.2d 506. Given this great discretion, the trial court is not required to accept at face value a spouse's valuation of assets or debts, or claims against the community. Bedenbender, supra. An appellate court may not set aside a trial court's factual findings absent manifest error or unless clearly wrong. Stobart v. State through Dept. of Transp. and Dev., 617 So.2d 880 (La.1993); Ball v. Ball, 32,851 (La.App. 2d Cir.3/1/00), 757 So.2d 824.
*1145 Credibility determinations are for the trier of fact, even as to the evaluation of expert witness testimony. Green v. K-Mart Corp., 03-2495 (La.05/25/04), 874 So.2d 838; Marsh v. USAgencies Cas. Ins. Co., 42,176 (La.App. 2d Cir.5/16/07), 957 So.2d 901. A fact-finder may accept or reject the opinion expressed by an expert, in whole or in part. Id. The effect and weight to be given to expert testimony rests within the broad discretion of the trier of fact. Williams v. State Farm Mut. Auto. Ins. Co., 36,439 (La.App. 2d Cir.10/23/02), 830 So.2d 379.
We can find no manifest error in the trial court's acceptance of Richardson's average approach method in calculating the subject expenses. Even by Johnston's own admission, this approach presented a closer estimate of the costs of the farming operations and a reasonable method of calculating expenses. Considering the broad discretion granted to the trial court in these matters, we find no error in the trial court's expense determination. Edith's argument is rejected.

II.
Regarding the community's ownership of J & C, Edith next argues that the corporation was formed solely out of the community property in 1994 and that her son's stated interest in the corporation resulted from an unauthorized donation of community property by James. She contends that pursuant to the provisions of La. C.C. art. 2349, James was prohibited from donating the community's farming equipment to Cliff through the format of J & C without her concurrence. Accordingly, pursuant to La. C.C. art. 2353, Edith argues that the formation of J & C was a relative nullity and that one-half of the value of the equipment holding company should be credited to her. The trial court's ruling awarded her only one-fourth of the value of J & C which was determined at the time of trial to be $93,832.[5]
The provisions of Civil Code Article 2349 read as follows:
The donation of community property to a third person requires the concurrence of the spouses, but a spouse acting alone may make a usual or customary gift of a value commensurate with the economic position of the spouses at the time of the donation.
The provisions of Civil Code Article 2353 provide in relevant part:
When the concurrence of the spouses is required by law, the alienation, encumbrance, or lease of community property by a spouse is relatively null unless the other spouse has renounced the right to concur. . . .
True donations of community property made without consideration and merely from liberality to third persons require the concurrence of both spouses. The general rule applies to both movables and immovables. 1 Katherine S. Spaht and Richard Moreno, Matrimonial Regimes § 5.14, in 16 Louisiana Civil Law Treatise (3d ed.2007). The exception to the rule provides that one spouse acting alone can make a "usual or customary gift of a value commensurate with the economic position of the spouses at the time of the donation." Id. When one spouse agrees to a transaction that requires consent of both, La. C.C. art. 2353 applies and makes the transaction relatively null. Id. This provision apparently carries over the whole spectrum *1146 of effects that attach to relative nullities, especially the provisions of La. C.C. art.2031 which provides that a relative nullity may be confirmed and may be invoked only by the person for whose interest the ground of nullity was established. Id.
A relative nullity may be confirmed or ratified. La. C.C. arts. 1842, 2031. There is no apparent requirement that the confirmation or ratification be in writing or particular form. Id. The signing of a document as a witness by the alleged non-concurring spouse was found to be an adequate confirmation of a relatively null servitude. Kee v. Francis Camel Const., 532 So.2d 378 (La.App. 3d Cir.1988). The signing of joint tax returns by the non-concurring spouse was held to be an adequate casual confirmation in First Federal Savings & Loan Ass'n of Warner Robins, GA. v. Delta Towers, Ltd., 544 So.2d 1331 (La.App. 4th Cir.1989), writ denied, 548 So.2d 1250 (1989). In Nelson v. Walker, 250 La. 545, 197 So.2d 619 (1967), the conduct of the non-concurring wife acted as a ratification of a relatively null partition executed between the spouses when the wife exercised all benefits of the partition, occupied the partitioned property, and contracted to sell the property.
Onerous donations (burdened with charges) and remunerative donations (recompense for services rendered) are not true donations and would be treated as any other onerous contracts within the power of one spouse acting alone. See La. C.C. arts. 1523-1527; Spaht and Moreno, supra. Additionally, the provisions of Civil Code Article 2350 provide:
The spouse who is the sole manager of a community enterprise has the exclusive right to alienate, encumber, or lease its movables unless the movables are issued in the name of the other spouse or the concurrence of the other spouse is required by law.
Documentation regarding the formation of J & C was introduced into evidence. Those documents and the parties' testimony evidence that Cliff and James formed J & C in 1994 and had 100 shares of common stock issued, 50 shares to each. The initial report named James and Cliff the directors and officers of the corporation. James was named President and Cliff, Vice President/Secretary Treasurer. A Sale with Assumption of Mortgage to J & C was executed by Cliff and James on April 15, 1994, conveying movable property and farm equipment. J & C assumed two equipment loans with balances totaling $671,615.87. J & C thereafter derived its income from renting the farming equipment to other family entities conducting the parties' farming operations.
Also introduced into evidence was a list handwritten by James in 1994 of the farm equipment transferred to J & C. The values shown for the equipment totaled $1,203,024, indicating that the value of the equipment exceeding its indebtedness was over $500,000. By the time of the proceedings before the Special Master and the trial court, the total value of the equipment, excluding the debt, was determined to be $93,832. By act of sale in 2003, Cliff conveyed his 50 shares of J & C to James. There was no payment for the shares as James simply assumed responsibility for the equipment indebtedness.
James testified that when he and Cliff formed J & C, Cliff owned a truck that he contributed to the corporation. James admitted that the truck was not listed on the 1994 conveyance of the equipment to J & C. Regarding the formation of J & C, James testified that it was Edith who "wanted him to" form the family farming entities like other farmers in Tensas Parish.
The trial court viewed James' transfer of the farming equipment to J & C and his *1147 sharing of the ownership of that corporation with his son as onerous transactions. This might be justified on the basis of Cliff's overall contributions to the farming operations, equipment maintenance and debt servicing that were expected following the formation of J & C and the other family farming entity in 1994. The trial court then concluded that James had authority under Civil Code Article 2350 to make the transfer of the equipment to a corporation which was not entirely owned by the spouses as community property. To the contrary, Edith now asserts that the large equity value in 1999 of the farming equipment, in excess of $500,000, demonstrates that J & C was capitalized solely with the parties' community property and that James effectively donated one-half of the community's farming equipment to Cliff.
From the record, we cannot conclude that the J & C transactions benefited Cliff as a pure gratuity. Cliff was expected to act and contribute to the family farming operations and servicing of the farming debt after 1994. The transfer of the equipment to him through the corporate arrangement may be viewed as an onerous donation. His actions through J & C and the family farming entity thereafter were to provide benefits enhancing the community's stake in those entities. The trial court's conclusions that the J & C transactions were onerous in nature and that James' actions were authorized were not error under this complicated factual arrangement.
Moreover, we find that any act of donation to Cliff through the creation of J & C was acknowledged and ratified by Edith in 1994 and thereafter. Edith testified that in 1994 she understood that the equipment was being transferred to J & C for the assumption of the debt by the corporation. She concurred in the joint use of the equipment by James and her son through the farming entities that were created.

Conclusion
For the reasons stated above, we amend the trial court judgment to increase the value of the unexpired term of the Ione Sublease to $250,000 and to delete the 2004 loss from the Ione Sublease income calculation, thus increasing Edith's reimbursement claim for that income to $69,175.74. In all other respects the judgment is affirmed. Costs of this appeal are to be assessed equally to the parties. After 1994, James received as income to the community an annual salary from J & C for five years before the end of the marriage. Under this arrangement with the parties' child, we find sufficient evidence of Edith's concurrence in the transfer of the equipment to J & C and her ratification of benefits which accrued to her son. Accordingly, the trial court's determination regarding Edith's interest in J & C is affirmed.[6]
JUDGMENT AMENDED IN PART AND AFFIRMED.
NOTES
[1] Traylor's appointment qualifies as the appointment of a special master in accordance with the provisions of La. R.S. 13:4165, which allows the court to appoint a special master where complicated legal or factual issues are presented. Related powers to court-appointed notaries are provided under the Code of Civil Procedure for partitions, La. C.C.P. art. 4604. Further the provisions of La. R.S. 9:2801(A)(3) allow the trial court to appoint experts to assist the court in the settlement and partition of community property. See Crais v. Crais, 98-1477 (La.App. 4th Cir.1/13/99), 737 So.2d 785, writ denied, 99-0763 (La.5/14/99), 741 So.2d 668.
[2] James and Cliff formed Wilkerson Farms II, a partnership created to maximize agricultural subsidies from the federal government (also called a "Mississippi Christmas Tree" arrangement). The corporation was composed of 8 individuals. Wilkerson Farms II rented the equipment from J & C.
[3] Edith contests only the trial court's inclusion of certain farm expenses relating to the farming operations of the Sublease from 2000-2003. For the year 1999, the record reflects that the court accepted the income calculation of her expert because James' expert had prepared no calculation for that year.
[4] The court's reasons for judgment reflect that the court disallowed legal and accounting fees and equipment rent for 2000-2001. The court also disallowed payroll taxes, workers' compensation, medical insurance, employee fringe benefits and insurance costs in certain years.
[5] At trial, the parties stipulated to the Special Master's value of J & C at $27,682. This sum, however failed to include the value of four corporate vehicles. The trial court valued the four vehicles at $66,150 and included this total in the value of J & C for a sum of $93,832.00. The parties do not contest this calculation on appeal nor the trial court's award of the corporate stock to James.
[6] In his appellate brief, James seeks additional reimbursement to the community for expenses related to wells which serviced the irrigation systems utilized on the farms. Because he has neither appealed nor answered the appeal raising this issue, this matter is not properly before us. La. C.C.P. art. 2133; Starnes v. Caddo Parish School Board, 598 So.2d 472 (La.App. 2d Cir.1992).